*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

REVEREND KENNETH KAUCHECK,

Plaintiff-Appellant,

v

DETROIT FREE PRESS, NIRAJ WARIKOO,
SURVIVORS NETWORK OF THOSE ABUSED
BY PRIESTS, DAVID CLOHESSY, MACOMB
DAILY, and JAMESON COOK,

Defendants-Appellees,

and

MATT JATCZAK,

Defendant.

UNPUBLISHED
June 11, 2020

No. 346093
Wayne Circuit Court
LC No. 17-002048-NO

Before: LETICA, P.J., and STEPHENS and O'BRIEN, JJ.

PER CURIAM.

In this action for defamation and false light invasion of privacy, plaintiff, Reverend
Kenneth Kaucheck, appeals as of right the trial court's order granting summary disposition to
defendants, the Detroit Free Press, Niraj Warikoo, the Macomb Daily, Jameson Cook, Survivors
Network of Those Abused by Priests (SNAP), and David Clohessy, under MCR 2.116(C)(10) (no
genuine issue of material fact).[1] This appeal has been decided without oral argument pursuant to
MCR 7.214(E). Because the statements in defendants' publications were either substantially true
or nonactionable opinions, we affirm.

---

[1] Defendant Matt Jatczak did not respond to plaintiff's complaint and a default was entered against
him. He is not a party to this appeal.

# I. BACKGROUND

Plaintiff became an ordained priest in 1976. On April 24, 2009, the Archdiocese of Detroit issued a press release announcing that allegations of sexual misconduct, dating back to the early years of his ministry, were made against plaintiff by a former parishioner at his former parish, Guardian Angels Parish in Clawson, Michigan. The press release provided, in pertinent part:

> Effective April 23, 2009, Fr. Kenneth Kaucheck, 62, has resigned as pastor of St. Mary Parish, Royal Oak, and pastor of St. James Parish, Ferndale. He has been placed on an administrative leave of absence and is currently restricted from any public ministry.
>
> The Archdiocesan Review Board has deemed substantive an allegation of sexual misconduct with a person under the age of 18 involving Fr. Kaucheck dating back to the early years of his ministry in the Detroit archdiocese.
>
> Information about the allegation was received in January by the archdiocese and immediately shared with civil authorities.
>
> Subsequently, the Archdiocesan Review Board commissioned an independent investigation that found the complaint to be of sufficient substance to require the placement of a temporary restriction on Fr. Kaucheck's service as a priest. A new pastor for St. Mary and St. James parishes has been appointed and will be announced at weekend lithurgies. Between now and this summer, Fr. John Hall, a senior (retired) priest, will serve as administrator.

According to plaintiff, he "vehemently" denied the allegations of sexual misconduct and "maintained his innocence." After plaintiff's removal from public ministry, he, along with Sister Diane Masson, cofounded a home for pregnant teenagers called Gianna House. At Gianna House, plaintiff served as the director of development and was responsible for fundraising.

On April 15, 2016, Jameson Cook, a reporter for the Macomb Daily, wrote an article for that publication in which he reported that the Archdiocese was in the process of removing plaintiff from his role at Gianna House. Cook reported in pertinent part:

> The Archdiocese of Detroit is seeking to remove a priest from his role at an Eastpointe facility for pregnant teenagers because he was found to have had sexual misconduct with a teenager girl in the 1970s.
>
> The Archdiocese believes the Rev. Kenneth Kaucheck should not continue as development director of Gianna House Pregnancy and Parenting Residence, which he founded last year along with Sister Mary Dianne Masson in a former convent adjacent to St. Veronica Catholic Church in Eastpointe.
>
> Kaucheck, while serving as a priest in Royal Oak and Ferndale, was banned in April 2009 from public ministry and placed on "temporary restriction" by the Archdiocese of Detroit after the organization determined that in 1976 he committed sexual misconduct with a 16-year-old-girl who he was counseling at Guardian

Angels Parish in Clawson. He was removed [from] that parish and transferred to a Dearborn parish.

In the article, Joe Kohn, a spokesman for the Archdiocese, was quoted as saying that "Father Kaucheck does remain barred from public ministry" and that the Archdiocese believed plaintiff's involvement at Gianna House amounted to "public ministry," so it had acted to remove plaintiff from his position at Gianna House in accordance with the Catholic Church's legal process, the Congregation for Clerk of the Vatican. Cook cited the Archdiocese's 2009 press release, noting that it stated that plaintiff was "placed on administrative leave after the Archdiocesan Review Board '[had] deemed substantive an allegation of sexual misconduct with a person under the age of 18 involving [plaintiff]' " in the early years of his ministry. The article also quoted Matt Jatczak of the Michigan chapter of SNAP as stating that plaintiff's affiliation and involvement with Gianna House "seems irresponsible," and that plaintiff's past should have raised "red flags." The article further stated, " 'Now [plaintiff] is being around teenage women who are in a vulnerable position, that should raise all kinds of red flags,' [Jatczak] said. 'I don't know how board members could allow [plaintiff] to get involved.' "

On April 17, 2016, Clohessy, the Executive Director of SNAP, issued a press release about plaintiff, stating in pertinent part:

> A priest who was ousted because he molested a girl now works for a non-profit that reportedly helps girls. And in a stunningly callous and reckless maneuver, top Detroit Catholic officials pretend they're powerless to stop him.
>
> *   *   *
>
> Fr. Kenneth Kaucheck works for Gianna House Pregnancy and Parenting Residence, "which he founded last year along with Sister Mary Diane Masson in a former convent," according to the Daily Tribune.
>
> In 2009, Fr. Kaucheck was ousted from Guardian Angels parish in Clawson because of credible allegations he had molested a girl.
>
> Five years ago, we wrote that Archbishop Allen Vigneron should disclose where Fr. Kaucheck was living, and put him in a "remote, secure treatment center so that kids can be safer and so that he can get treatment."
>
> Vigneron ignored us.
>
> *   *   *
>
> As best we can tell, Vigneron evidently told few or no parishioners where Kaucheck was, which, we believe, is a violation of church policies and Vigneron's repeated pledges to be "open and transparent" in clergy sex cases.
>
> Vigneron's irresponsible secrecy is one reason [the] non-profit's chair, Dr. Robert Walsh, says he was unaware of the accusation against Fr. Kaucheck and Fr. Kaucheck's suspension.

But shame on him. A simple Google search would have shown that this priest allegedly molested at least one girl. (And we strongly suspect that he molested others).

Detroit Archbishop Allen Vigneron claims he's asking [for] the Vatican's help in ousting Fr. Kaucheck from the non-profit.

He's being deceptive, as is his public relations staffer, Joe Kohn. Both men know the church is a monarchy, that priests swear to obey their bishops, and that it's simple, cheap and easy for church officials to protect kids from Father Kaucheck.

All they need to do is use the dozens of church websites and bulletins to warn families about Fr. Kaucheck. Vigneron should insist that every priest announce from the pulpit next Sunday what Fr. Kaucheck has done and where Fr. Kaucheck is. That's a sure fire, immediate way to make it harder for him to assault another girl.

Kohn and Vigneron can also threaten Fr. Kaucheck, saying, "We'll give your full personnel file to law enforcement unless you do as we say." Frankly, they should have done so years ago.

Kohn claims Detroit church officials "are addressing the matter under canon law." Baloney. Canon law is what bishops hide behind when they are too timid or self-serving to take decisive action against a child molesting cleric. We know of no bishop anywhere who has been penalized under "canon law" for taking steps to safeguard kids from a predator priest.

So Vigneron can and should take immediate steps to warn parents, police, prosecutors, parishioners and the public about Fr. Kaucheck and remove him from working anywhere he might have access to youngsters.

Now, let's talk about a painfully common pattern: Bishops suspend predator priests, refuse to monitor them, and they become coaches, teachers, counselors and find other ways to be around kids.

\* \* \*

No matter what church officials do or don't do, we urge every single person who saw, suspected or suffered child sex crimes and cover ups in Catholic churches or institutions in the Detroit area to protect kids by calling police, get help by calling therapists, expose wrongdoers by calling law enforcement, get justice by calling attorneys, and be comforted by calling support groups like ours. This is how kids will be safer, adults will recover, criminals will be prosecuted, cover ups will be deterred and the truth will surface.

On April 18, 2016, the Archdiocese issued a second press release about plaintiff, which provided in pertinent part:

-4-

Father Kenneth Kaucheck was barred from public ministry by the Archdiocese of Detroit in April 2009. At that time, the Archdiocesan Review Board had deemed substantive an allegation of sexual misconduct with a person under the age of 18 involving Fr. Kaucheck, dating back to the early years of his ministry in the Archdiocese.

The Archdiocese raised objections when it first learned Father Kaucheck was serving as development director and ex-officio board member of Gianna House, an Eastpointe-based ministry for pregnant teenagers which opened in 2015. Gianna House is not owned, operated or officially affiliated with the Archdiocese of Detroit.

Father Kaucheck was co-founder of Gianna House and took on leadership positions there, and did so without the knowledge and approval of the Archdiocese. Still, it has been the position of the Detroit Archdiocese that Father Kaucheck's service at Gianna House constituted a public ministry and was in violation of the restrictions placed on his ministry. The Archdiocese continues to address this matter in a canonical process overseen by the Congregation for Clergy at the Vatican. Father Kaucheck resigned from his position at Gianna House on April 17, 2016.

On May 9, 2016, the Detroit Free Press published an article written by Niraj Warikoo about plaintiff, headlined "*Priest removed for sex abuse works at pregnancy center for teens*[.]" The article stated in part:

The Rev. Kenneth Kaucheck, 69, was banned from public ministry by the Archdiocese of Detroit in 2009 after church officials determined he had sexual misconduct in the 1970s with a 16-year-old girl he was counseling as a priest.

The article quoted Kohn as stating that plaintiff's position at Gianna House violated the restriction on his public ministry from 2009, and " '[w]e assert that [plaintiff] should not be allowed to continue in this position.' " The article went on to note that the victim's allegations against plaintiff were corroborated by a former receptionist at the Guardian Angels parish. This witness was quoted as recounting that the victim told her about the sexual misconduct in 1976, and that the victim showed her plane tickets for a flight that plaintiff and the victim took to Florida together. While noting that plaintiff had not commented publicly about the allegations, Warikoo reported that the Oakland County Prosecutor had declined to pursue criminal charges against plaintiff 33 years later because "the teen was of legal consent in 1976 when the sexual relationship took place." Warikoo also included the following comments from Clohessy:

[Clohessy] . . . said in a statement last month that it's disconcerting that "a priest who was ousted because he molested a girl now works for a nonprofit that reportedly helps girls."

"It's inexcusable for any nonprofit to hire a credibly accused child molesting cleric. A simple Google search would have shown that [plaintiff] is

-5-

potentially dangerous and should never be given any position or title that confers respect, much less gives him access to vulnerable people."

Clohessy said there's a pattern of Catholic officials allowing suspended priests to resurface in other roles, sometimes around children. Prosecutors declined to press charges against [plaintiff] in 2009 because they said the girl was at the age of legal consent.

Clohessy also criticized the archdiocese and Archbishop Allen Vigneron for not being more active in alerting Catholics about [plaintiff].

Clohessy said that "Vigneron's irresponsible secrecy is one reason" why Gianna House's board chairman, Dr. Robert Welch, "says he was unaware of the accusations against [plaintiff] and [plaintiff's] suspension."

In a second article for the Detroit Free Press, dated May 19, 2016, Warikoo reported that plaintiff had stepped down from his position at Gianna House, and described plaintiff as "a Catholic priest who was removed in 2009 from churches after allegations he abused a teen girl." Sister Masson was quoted as saying that plaintiff did not interact with any "pregnant and parenting teens" while at Gianna House. Warikoo also reported about the past allegations against plaintiff:

[Plaintiff] was banned from public ministry by the Archdiocese of Detroit in 2009 after church officials determined he had committed sexual misconduct in the 1970s with a 16-year-old girl he was counseling as a priest. In 2009, a woman came forward with allegations that [plaintiff] abused her when he was counseling her at Guardian Angels Parish in Clawson in 1976, when she was a teen.

Noting that the Oakland County Prosecutor's office had declined to prosecute plaintiff, Warikoo also quoted McGrath, a spokesman for the Archdiocese, who recounted that the Archdiocese had been in contact with plaintiff and his canon lawyer in 2015 to inform him he was violating the prohibition on his public ministry by being involved with Gianna House. The article stated that according to a press release from the Archdiocese, "[t]he Archdiocese continues to address this matter in a canonical process overseen by the Congregation for Clergy at the Vatican." The article quoted Diane Trombley, a board member of Gianna House, as saying that it was her understanding that the allegations against plaintiff had been adjudicated through the Vatican court system, and "[she] wasn't aware of anything other than [plaintiff's] desire to establish a residence for teen girls who were pregnant." The article, again quoting Clohessy, further stated:

[W]hile [plaintiff] resigning was a good first step, the Archdiocese needs to do more to alert other churches and Catholic centers about [plaintiff] "through parish bulletins, church websites, pulpit announcements and personal visits to churches by the Archbishop."

If the Archbishop had done that previously, [plaintiff] might not have been able to cofound Gianna House, Clohessy said.

"They should have disclosed the whereabouts of every child-molesting cleric who has worked for or lives in the Archdiocese so that kids can be protected," he said.

In an article published in the Macomb Daily on May 20, 2016, Cook reported that "[a] Catholic priest who was removed from public ministry seven years ago due to prior sexual misconduct with a teenage girl has resigned from his post with an Eastpointe teen-pregnancy center." Quoting the April 18, 2018 press release of the Archdiocese, Cook reported that "[plaintiff] was a co-founder of Gianna House and took on leadership positions there . . . without the knowledge and approval of the Archdiocese." Cook reported that plaintiff, in his work at Gianna House, did not come into contact with any of the young girls who were pregnant, and the facility had not yet started to house pregnant individuals because of renovations, but it had offered classes on prenatal care, child birth, early childhood development, and nutrition. Referring to plaintiff's "banishment" from the public ministry and the Archdiocese's efforts to remove him from Gianna House, Cook noted:

> Kaucheck was pastor at St. Mary Parish in Royal Oak and St. James Parish in Ferndale when he was banned in April 2009. The Archdiocese determined that in 1976 he committed sexual misconduct with a 16-year-old girl whom he was counseling at Guardian Angels Parish in Clawson. He was removed from that parish and transferred to a Dearborn parish.

> \* \* \*

> Kaucheck remains a priest but cannot practice any form of public ministry. He can't perform Mass or dress as a priest in public, [Ned McGrath, Archdiocese spokesman] said.

> McGrath said Kaucheck has no assignment with the Archdiocese but receives a salary that could range from about $25,000 to $35,000 per year, plus benefits.

On July 8, 2016, counsel for plaintiff contacted the Detroit Free Press and requested that it publish a retraction because the articles concerning plaintiff contained false statements about, among other things, whether the sexual misconduct allegations against plaintiff were proven. On August 4, 2016, counsel for plaintiff contacted the Macomb Daily and requested that it publish a retraction for the same reason.

Plaintiff eventually filed a two-count complaint alleging defamation and false light invasion of privacy. After discovery, all defendants moved for summary disposition under MCR 2.116(C)(10), and the trial court granted their motions and dismissed plaintiff's complaint. This appeal followed.

## II. ACTIONABILITY OF STATEMENTS

Plaintiff argues that the trial court erred in determining that defendants' communications about him were not actionable. We disagree.

We review de novo a trial court's decision to grant summary disposition. *Mitan v Campbell*, 474 Mich 21, 23; 706 NW2d 420 (2005). Defendants moved for summary disposition under MCR 2.116(C)(10). As our Supreme Court explained in *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019):

> A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim. *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson*, 502 Mich at 761 (quotation marks, citation, and brackets omitted).

The issue whether defendants' challenged statements are capable of defamatory meaning, and are therefore actionable under Michigan law, are preliminary questions of law, *Ireland v Edwards*, 230 Mich App 607, 619; 584 NW2d 632 (1998), which we review de novo. *South Dearborn Environmental Improvement Ass'n, Inc*, 502 Mich at 360 n 11.

> A plaintiff alleging defamation must satisfy the following four elements:
>
> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113; 793 NW2d 533 (2010) (quotation marks and citation omitted).]

To establish a claim of false light invasion of privacy, a plaintiff must

> show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable *by attributing to the plaintiff characteristics, conduct, or beliefs that were false* and placed the plaintiff in a false position. [*Derderian v Genesys Health Care Sys*, 263 Mich App 364, 385; 689 NW2d 145 (2004) (citation and quotation marks omitted; emphasis added).]

Based on the foregoing, to establish either a claim for defamation or a claim for false light invasion of privacy, the plaintiff must show that what the defendant stated was false. We therefore begin by addressing whether the statements and information in defendants' articles were false.

In *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 258; 487 NW2d 205 (1992), our Supreme Court noted that the common law has never imposed a requirement on defendants to prove that their publication "is literally and absolutely accurate in every minute detail." Instead, Michigan courts have followed the approach set forth in the Restatement of Torts, which provides that minor inaccuracies of expression are not determinative

as long as the allegedly defamatory statement is, in substance, true. *Id*. at 258-259. Accordingly, a reviewing court must consider "the sting of the article to determine its effect on the reader," and if the "literal truth" would produce the same effect, minor differences will be considered inconsequential. *Id*. at 259.

In the trial court and on appeal, the thrust of plaintiff's argument with respect to the falsity of defendants' statements is grounded in his contention that the wording and phrasing of their reporting conveyed to the reader that plaintiff had in fact been criminally convicted of a sexual misconduct offense. According to plaintiff, had defendants accurately reported the substance of the Archdiocese press releases—that it was only *alleged* that plaintiff had engaged in sexual misconduct, an allegation that the Archdiocese found substantive—such reporting would have had a completely different impact on the reader. In plaintiff's words, the reporting by defendants "translate[d] into a guilty conviction by the [Archdiocese] of sexual misconduct and molestation of a child," whereas the Archdiocese press releases actually reported that it took disciplinary action against its employee because of an allegation of sexual misconduct.

In *Rouch*, 440 Mich at 260, the Michigan Supreme Court acknowledged that the substantial truth doctrine is frequently used to address two common reoccurring problems: (1) when publications contain "minor inaccuracies" and (2) when publications contain "technically incorrect or flawed use of legal terminology." In that case, the Court rejected arguments similar to those made by plaintiff. The plaintiff in *Rouch* had been arrested and booked on a charge of first-degree criminal sexual conduct arising from the alleged sexual assault of his former wife's babysitter, and he was released after an informal bond hearing. *Id*. at 243, 245, 249. It was not disputed that the plaintiff was not formally arraigned on a warrant. *Id*. at 250. The plaintiff filed a libel action against the defendant because it stated in an article that the plaintiff had been "charged" with sexual assault. *Id*. at 250, 260. The *Rouch* Court disagreed with the reasoning of this Court that by using such terminology, the defendant made a materially false statement, particularly because this Court did not attempt to evaluate the "gist" or the "sting" of the article to the layperson reading it. *Id*. at 262-263. The Court reasoned that, although the defendant's use of the "charged" was inaccurate in a technical sense, liability could not be imposed because doing so would "totally eviscerate the 'breathing space' " that the constitution requires in order to protect First Amendment rights. *Id*. at 265-268. The *Rouch* Court explained that an independent review of the record did not support the conclusion that the defendant's use of the word "charge" meant that the article about plaintiff was materially false, reasoning:

> When writing about criminal justice or legal matters, newspapers would be forced to recapitulate technical legal terminology employed by courts or law enforcement personnel even where popular words might be clearer for the lay reader. Attempting to reframe legal documents and events with legal significance into popular or lay terminology would be fraught with peril, and newspapers would do so at their risk. As one court remarked, there is "no authority for plaintiff's contention that a newspaper article reporting a judicial proceeding must indicate every possible interpretation of every word used in a complaint or other legal document." [*Id*. at 268-269.]

The plaintiff in *Rouch* also challenged the defendant's statement that the plaintiff's children had identified him, when in fact it was the children of his former wife (his former stepchildren),

who had identified him. *Id*. at 250, 260. The Court rejected the plaintiff's claim that the article about him was materially false given the minor inaccuracy in the defendant's reporting, concluding that the gist or sting of the defendant's publication—that the plaintiff was arrested for a sexual offense on the basis of an identification of people who knew him—was nonetheless true. *Id*. at 269-271. The *Rouch* Court ultimately held that this minor inaccuracy about which individuals identified him, as well as the technically incorrect use of legal terminology with respect to the word "charged," did not impact the substantial truth of the article. *Id*. at 271.

Turning first to the articles published by the Macomb Daily, plaintiff challenges the following statements in the article published on April 15, 2016:

> The Archdiocese is seeking to remove a priest from his role at an Eastpointe facility for pregnant teenagers because he was found to have had sexual misconduct with a teenage girl in the 1970s. The Archdiocese believes the Rev. Kenneth Kaucheck should not continue as development director of Gianna House Pregnancy and Parenting Residence, which he founded last year along with Sister Mary Diane Masson in a former convent adjacent to St. Veronica Catholic Church in Eastpointe.

> Kaucheck, while serving as a priest in Royal Oak and Ferndale, was banned in April 2009 from public ministry and placed on temporary restriction by the Archdiocese of Detroit after the organization determined that in 1976 he committed sexual misconduct with a 16-year-old girl who he was counseling at Guardian Angels Parish in Clawson.

Plaintiff also challenged the following statements from the May 20, 2016 article in the Macomb Daily:

> A Catholic priest who was removed from public ministry seven years ago due to prior sexual misconduct with a teenage girl has resigned from his post with an Eastpointe teen-pregnancy center.

> "[Plaintiff] was a co-founder of Gianna House and took leadership positions there, and did so without the knowledge or approval of the Archdiocese," the Archdioceses says in an April 18 statement posted on its web site.

A review of the Archdiocese's April 18, 2016 press release confirms that the information that the Macomb Daily reported is substantially true and accurate. The press release states that plaintiff was "barred from public ministry" after the Archdiocese "deemed substantive an allegation of sexual misconduct with a person under the age of 18[.]" The press release also notes that plaintiff assumed the role of co-founder of Gianna House and participated in leadership roles there "without the knowledge or approval of the Archdiocese," and that the Archdiocese considered plaintiff's service at Gianna House as engaging in "public ministry and was in violation of the restrictions placed on his ministry." In addition, the Archdiocese's other press release—issued in 2009—similarly states that the Archdiocesan Review Board had "deemed substantive an allegation [against plaintiff] of sexual misconduct with a person under the age of 18[.]" The 2009 press release further indicates that after the Archdiocesan Review Board "commissioned an independent investigation" and found the allegation against plaintiff to "be of sufficient substance

-10-

to require the placement of a temporary restriction on [plaintiff's] service as a priest." A comparison of the statements published in the Macomb Daily's articles against the statements in the Archdiocese press releases confirms that the Macomb Daily's reporting of matters regarding the sexual misconduct allegations against plaintiff, the Archdiocese's reactions to the allegations, and plaintiff's involvement in Gianna House, was substantially true and accurate. Therefore, the trial court did not err by ruling that there was no genuine issue of material fact with regard to whether these statements in the Macomb Daily's publication were materially false.

Turning to the articles published by the Detroit Free Press, plaintiff challenges the headline of the article published on May 9, 2016, "*Priest removed for sex abuse works at pregnancy center for teens*." Plaintiff claims that the following statements in the same article are also false and defamatory:

> The Rev. Kenneth Kaucheck, 69, was banned from public ministry by the Archdiocese of Detroit in 2009 after church officials determined he had sexual misconduct in the 1970s with a 16-year-old girl he was counseling as a priest.

> Opened last year in a former convent, the center takes in teenagers and young women who are pregnant, assisting them and any children they might later have.

Plaintiff also challenges statements in the Detroit Free Press's May 19, 2016 article, headlined "*Catholic priest in abuse scandal resigns from pregnancy center*." Plaintiff challenges this statement from that article:

> In a statement, the Archdiocese of Detroit said : . . [plaintiff] was a cofounder of Gianna House and took on leadership positions there, and did so without the knowledge or approval of the Archdiocese.

Again, the statements in the articles simply repeat what was noted in the Archdiocese's press releases. The Detroit Free Press used the term "removed" from the public ministry, but this was consistent with the Archdiocese's statement that plaintiff was "placed on an administrative leave of absence and is currently restricted from any public ministry." Although the terminology that Warikoo used in his article was different and potentially more inflammatory than that of the press releases, "the sting of the article" remains the same—after an allegation that plaintiff engaged in sexual misconduct with a minor was found to be substantive, plaintiff was removed from his position serving in the public ministry of the Archdiocese. Because the "literal truth" reflected in the Archdiocese press release produces the same effect as what Warikoo wrote, the minor differences in terminology are not material. See *Rouch*, 440 Mich at 259. Thus, the evidence does not establish a genuine issue of material fact with regard to whether the statements in the publications of the Detroit Free Press were materially false.

We next address plaintiff's challenges to statements made by Jatczak, Clohessy, and SNAP, some of which were quoted in the Macomb Daily by Cook and the Detroit Free Press by Warikoo. In *Milkovich v Lorain Journal Co*, 497 US 1, 19; 110 S Ct 2695; 111 L Ed 2d 1 (1990), the United States Supreme Court declined the respondents' invitation to fashion a bright-line rule that all opinions are protected under the First Amendment. In rejecting the respondents' request,

the Court noted that under *Philadelphia Newspapers v Hepps*, 475 US 767; 106 S Ct 1558; 89 L Ed 2d 783 (1986), statements on matters of public concern must be able to be proven as false to be actionable, and that "*Hepps* ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich*, 497 US at 19-20. Additionally, the Court recognized a line of authority holding that statements that cannot reasonably be construed as stating facts about an individual will receive protection from the First Amendment, a principle of law intended to foster "imaginative expression" and "rhetorical hyperbole" that underlies the important history of encouraging public discourse in the United States. *Id.* at 20.

Quoting *Milkovich*, 497 US at 19, this Court in *Ghanam v Does*, 303 Mich App 522, 545; 845 NW2d 128 (2014), stated that to rise to the level of defamation, a statement must assert facts that are " 'provable as false.' " This Court has described the distinction between communications that are actionable and those that are not as distinguishing between objectively verifiable facts and subjective assertions. *Kevorkian v American Med Ass'n*, 237 Mich App 1, 6; 602 NW2d 233 (1999). If a statement put forth as an opinion implies an assertion of an objective fact, it can be defamatory; the pertinent inquiry is whether a reasonable fact-finder could determine that the challenged communication implies a defamatory meaning. *Ghanam*, 303 Mich App at 545. Conversely, if a statement cannot be construed as asserting an actual fact about an individual, it cannot serve as the basis for a defamation lawsuit or a similar claim. *Id.* at 546. But if the challenged statements use exaggerated terms such as calling a person a "crook," a "traitor," or accusing them of stealing or engaging in criminal activities, a court takes a further look at the communications. *Id.* If the statements, in context, are merely exaggerations of a type often used in public commentary and can be said to be rhetorical hyperbole, they are protected under the First Amendment. *Id.* In making this review, courts must be mindful of "[t]he context and forum" in which statements are made, because that is relevant in determining whether a reasonable reader would construe the challenged communications as stating actual facts. *Id.* For example, this Court has recognized that communications espoused from "Internet message boards and similar communication platforms are generally regarded as containing statements of pure opinion, rather than [actionable] statements or implications of actual, provable fact[s]." *Id.* at 547. See also *Edwards v Detroit News*, 322 Mich App 1, 13; 910 NW2d 394 (2017) (recognizing that communications that could not be interpreted in a reasonable manner as articulating actual facts about an individual are not actionable); *Sarkar v Doe*, 318 Mich App 156, 179; 897 NW2d 207 (2016) (setting forth the applicable principles of law in discerning whether a challenged communication can be proven as false and is therefore actionable as defamatory).

But, again, communications that are premised on false statements of fact, and include facts that can be objectively proven as false, or "direct accusations or inferences of criminal conduct," are not protected by the First Amendment. *Kevorkian*, 237 Mich App at 8.

> Language that accuses or strongly implies that someone is involved in illegal conduct crosses the line dividing strongly worded opinion from accusation of a crime. [*Hodgins v Times Herald Co*, 169 Mich App 245, 254; 425 NW2d 522 (1988)]. Indeed, this Court has stated that an accusation of the commission of a crime is defamatory per se, meaning that special harm need not be proved. *Wilkerson v Carlo*, 101 Mich App 629, 632; 300 NW2d 658 (1980). [*Kevorkian*, 237 Mich App at 8.]

-12-

With regard to the Macomb Daily publications, plaintiff challenges the following statements made by Jatczak of the Michigan Chapter of SNAP in the April 15, 2016 article:

> Matt Jatczak of the Michigan chapter of [SNAP], said [plaintiff's] involvement [in Gianna House] "seems irresponsible." He said [plaintiff's] past should have raised "red flags."

> "Now [plaintiff] is being around teenage women who are in a vulnerable position, that should raise all kinds of red flags," he said. "I don't know how board members could allow him to get involved.

The comments attributed to Jatczak are not actionable because, in characterizing plaintiff's work at Gianna House as raising "red flags," stating that his involvement "seems irresponsible," and criticizing the Archdiocese and the Gianna House's board for allowing plaintiff to potentially work with vulnerable teenage women, Jatczak was not stating objectively verifiable facts about plaintiff. *Kevorkian*, 237 Mich App at 6. These statements were pure opinions without implying an assertion of an objective fact. See *Ghanam*, 303 Mich App at 545.

Plaintiff also challenges the following statements attributed to Clohessy in the May 9, 2016 article published by the Detroit Free Press:

> David Clohessy, director of [SNAP], said in a statement last month that it's disconcerting that "a priest who was ousted because he molested a girl now works for a nonprofit that reportedly helps girls. It's inexcusable for any nonprofit to hire a credibly accused child molesting cleric. A simple Google search would have shown that [plaintiff] is potentially dangerous and should never be given any position or title that confers respect, much less gives him access to vulnerable people."

The article goes on to report that Clohessy observed "a pattern of Catholic officials allowing suspended priests to resurface in other roles," often around children. Clohessy also accused the Archdiocese, particularly Archbishop Vigneron, of not "being more active" in informing Catholics about plaintiff, stating that Archbishop Vigneron engaged in "irresponsible secrecy."

In the May 19, 2016 article, Clohessy was quoted as stating that while plaintiff stepping down from his involvement with Gianna House was a positive first step, the Archdiocese needed to do more to protect children.

> "[The Archdiocese] should disclose the whereabouts of every child-molesting cleric who has worked or lives in the Archdiocese so that kids can be protected," [Clohessy] said.

Clohessy's comments were made in the context of criticizing the Archdiocese for not acting to alert Catholics about plaintiff "through parish bulletins, church websites, pulpit announcements and personal visits to churches by the Archbishop." According to Clohessy, if the Archdiocese

had taken such necessary action, plaintiff would not have had the opportunity to become involved in Gianna House.

Initially, it is important to consider the context in which Clohessy's statements, including his statement that "a priest who was ousted because he molested a girl now works for a non-profit that reportedly helps girls," were made. This statement, as well as Clohessy's reference to "a simple Google search" and the need for the Archdiocese to inform Catholics about plaintiff, were first articulated in SNAP's April 17, 2016 press release. In *Ghanam*, this Court opined that the "context and forum in which statements appear" will aid the court is determining whether a reasonable reader would interpret the statements as asserting facts that could be proven as true or false. *Ghanam*, 303 Mich App at 546. This specific statement by Clohessy was first made on the webpage for SNAP, a website for survivors of sexual abuse by priests, as well as on the website, www.bishopaccountability.org. Clohessy further characterized the decision of the Archdiocese to allow plaintiff to be involved at Gianna House as a "stunningly callous and reckless maneuver[.]" While the balance of Clohessy's allegations are inflammatory, certainly offensive to plaintiff, and, when read literally, appear to accuse plaintiff of engaging in criminal conduct, the statements in context (particularly given Clohessy's occupation criticizing the Catholic church and members of the Catholic clergy regarding its involvement in sexual abuse claims) are best characterized as "rhetorical hyperbole and imaginative expression," *id*., rather than *stating assertions of fact against plaintiff*. We acknowledge that in both the May 9, 2016 and May 19, 2016 articles, Clohessy used strong language when stating that plaintiff was "ousted [from the Archdiocese] because he molested a girl," and referring to plaintiff as a "credibly accused child-molesting cleric[.]" However, an individual reading Clohessy's language strongly criticizing plaintiff, the Archdiocese, and Gianna House, would recognize Clohessy's remarks as "rhetorical hyperbole, [and] . . . vigorous epithet[s] used" to express disapproval and disdain of the Archdiocese's failure to more closely monitor plaintiff's activities working with the public and of Gianna House for allowing plaintiff to be part of its organization. See *Ghanam*, 303 Mich App at 546, 550 (if a reasonable reader would discern that epithets are intended to convey "strong disapproval rather than an accusation of criminal activity or actual misconduct," they will not be regarded as defamatory and comments made with the intention to denigrate, ridicule and criticize, as opposed to claiming "knowledge of actual facts" are not actionable as a matter of law). Thus, the trial court correctly held that these statements were nonactionable.

In sum, because the challenged statements are not defamatory as a matter of law, the trial court did not err by granting summary disposition in favor of defendants. Given our disposition of this issue, it is unnecessary to address plaintiff's remaining issues.[2]

---

[2] The trial court ruled that it could not review the case under the ecclesiastical abstention doctrine. Plaintiff challenges this ruling on appeal, but even if the trial court's ruling on this issue was error, plaintiff's claims are still not actionable for the reasons explained above.

Similarly, plaintiff challenges the trial court's ruling that he was a limited-purpose public figure. While plaintiff's status as a limited-purpose public figure versus a private figure would change what he was required to prove, see *Smith*, 487 Mich at 114; *Rouch*, 440 Mich at 252, his

-14-

Affirmed.

/s/ Anica Letica
/s/ Cynthia Diane Stephens
/s/ Colleen A. O'Brien

---

status does not matter for purposes of resolving the issues on appeal. That is, regardless of whether plaintiff was a limited-purpose public figure or a private figure, his defamation and invasion of privacy false light claims are nonactionable for the reasons explained above.