# STATE OF MICHIGAN

# COURT OF APPEALS

JAMES EDWARDS,

        Plaintiff-Appellant,

v

DETROIT NEWS, INC,

        Defendant-Appellee,

and

BANKOLE THOMPSON,

        Defendant-Appellee.

PUBLISHED
October 31, 2017
9:00 a.m.

No. 334058
Wayne Circuit Court
LC No. 16-004874-NO

Before: GLEICHER, P.J., and FORT HOOD and SWARTZLE, JJ.

SWARTZLE, J.

The Restatement (Second) of Torts § 559 lists "membership in the Ku Klux Klan" as the quintessential illustration of a defamatory statement. In an opinion piece in *The Detroit News*, columnist Bankole Thompson asserted that radio show host James Edwards is a "leader" of the Ku Klux Klan. There is no record evidence to suggest that Edwards holds a formal leadership position in the Ku Klux Klan, nor is there any record evidence to suggest that he is even a member. Notwithstanding this lack of formal relationship, Edwards has espoused views consistent with those associated with the Klan and, equally as important, he has repeatedly and publicly embraced several individuals who are strongly associated with the Klan. Mindful of Aesop's lesson, "A man is known by the company he keeps,"[1] we hold that Edwards cannot make claims of defamation or invasion of privacy and affirm summary disposition in favor of defendants.

---

[1] Aesop, *The Ass and the Purchaser.*

-1-

I. BACKGROUND

A. THE CONTEXT—THE KU KLUX KLAN AND *THE POLITICAL CESSPOOL*

To better understand the underlying dispute, it is helpful to review briefly the history of the Ku Klux Klan as well as James Edwards' radio show, *The Political Cesspool*.[2]

1. A BRIEF HISTORY OF THE KU KLUX KLAN

The Ku Klux Klan has a long, sordid history. From a secret club started by six young ex-Confederate soldiers, the Klan transformed itself into a terrorist force bent on turning back Reconstruction in the years immediately following the Civil War. The Klan's reputed first leader—"Imperial Wizard"—was Confederate General Nathan Bedford Forrest. In response to the Klan's growing power, Congress held hearings and passed a strong anti-Klan law that, among other things, authorized the President to declare martial law and suspend the writ of habeas corpus. The Ku Klux Klan faded away in the late 1800s.

The terrorist group experienced a rebirth of sorts during WW I, inspired in no small part by the silent film, *The Birth of a Nation*. During the decades that followed, the strength of the

---

[2] The following background is gleaned from the parties' briefs and exhibits, as well as Edwards' radio show website (www.thepoliticalcesspool.org), the latter of which is quoted and cited extensively in the complaint and briefs. We also reviewed the following public records and judicial decisions: United States House of Representatives Committee on Un-American Activities, *The Present-Day Ku Klux Klan Movement* (Washington, DC: United States Government Printing Office, 1967); *Virginia v Black*, 538 US 343; 123 S Ct 1536; 155 L Ed 2d 535 (2003); *US v Milbourn*, 600 F3d 808 (CA 7, 2010); *United States v Black*, 685 F2d 132 (CA 5, 1982); *State v Duke*, 362 So 2d 559 (La, 1978), overruled by *State v Johnson*, 664 So 2d 94 (1995). See MRE 201; *Johnson v Dep't of Natural Resources*, 310 Mich App 635, 649; 873 NW2d 842 (2015) (noting that MRE 201 allows a court to take judicial notice of public records). The following newspaper articles were also consulted: Eli Saslow, *The White Flight of Derek Black*, Washington Post (Oct 15, 2016); Peter Applebome, *Duke: The Ex-Nazi Who Would Be Governor*, The New York Times (Nov 10, 1992). We acknowledge that the two articles were not included in the record, and this Court cannot take judicial notice of a newspaper article for the truth of the matters asserted therein because of the general prohibition against inadmissible hearsay. *People v McKinney*, 258 Mich App 157, 161 n 4; 670 NW2d 254 (2003). We can, however, take notice of the fact that the two articles were published, and this is especially pertinent in a defamation case implicating First Amendment principles, where the inquiry focuses on, among other things, what reasonable readers would have understood at the time the communication was made and how a plaintiff's reputation in the community was impacted. Cf *Washington Post v Robinson*, 935 F2d 282, 291-292 (CA DC, 1991). In any event, the two articles merely supplement the cited public records and judicial decisions with respect to background on David Duke and Stephen Donald "Don" Black, and they have no direct bearing on our analysis of Edwards' claims against defendants.

Ku Klux Klan ebbed and flowed, reaching its near-apex during the Civil Rights clashes of the 1960s. Again, in response, Congress held hearings and the Klan's visibility waned.

During the 1970s, David Duke became the face of the modern-day Ku Klux Klan. Joining the Klan in the late 1960s, Duke eventually became the Grand Wizard of the Knights of the Ku Klux Klan. Duke later left the organization and started the National Association for the Advancement of White People, a white nationalist group. Duke currently hosts a radio show and is a frequent guest on *The Political Cesspool.*

Stephen Donald "Don" Black succeeded Duke as Grand Wizard of the Knights of the Ku Klux Klan. Black was later arrested and convicted of trying to overthrow the small island Republic of Dominica. He later started a bulletin board system in the 1990s called Stormfront.org. The bulletin board remains active today as an online forum for white nationalism, white separatism, Holocaust denial, neo-nazism, and racism, among other topics.

While its messaging and tactics have changed over the years, at its core, the Ku Klux Klan has remained a loosely organized movement fueled by racism, white supremacism, anti-Semitism, and nativism.

## 2. *THE POLITICAL CESSPOOL*

Edwards is the creator and host of *The Political Cesspool* radio show and website. He started the radio show in October 2004. Based in Memphis, Tennessee, the show went on a brief hiatus in 2008, but otherwise has been on the air continuously to present day. The radio show is currently carried on the Liberty News Radio Network.

Edwards published his "Statement of Principles" on the show's website. Among other statements, Edwards proclaims the following:

- "*The Political Cesspool Radio Program* stands for the [sic] The Dispossessed Majority. We represent a philosophy that is pro-White . . . ."

- "We wish to revive the White birthrate above replacement level fertility and beyond to grow the percentage of Whites in the world relative to other races."

- "America would not be a prosperous land of opportunity if the founding stock were not Europeans. . . . You can't have a First World nation with a Third World population."

- "Secession is a right of all people and individuals. It was successful in 1776 and this show honors those who tried to make it successful from 1861 – 1865."

- "OUR MOTTO: No Retreat, No Surrender, No Apologies."

- As part of his published principles, Edwards includes an endorsement from a person asserting that there is a "genocide against European-Americans,"

subsequently expanded or clarified to mean "the genocide of immigration and intermarriage."

Immediately below his Statement of Principles, Edwards is pictured with Duke, sitting together at a speaking engagement in Memphis, Tennessee.

Also included on the website is a page entitled, "A Short History of the Political Cesspool Radio Program." As part of the radio show's history, Edwards claims that the show has filled an important gap in the public debate "because nobody else was speaking up for our People." As part of the show's political activism, he recounts that his radio show "save[d] three confederate parks" from the efforts of "a couple of black malcontents in Memphis" and other "black agitators." One of the parks in question was named after Gen. Nathan Bedford Forrest (see supra) and, according to Edwards, the park is "the burial site of the legendary hero." Edwards characterizes his show's listeners as "pro-Confederate supporters," and he maintains that as host, he has "an unapologetically pro-White viewpoint" and his is "the premier voice for European Americans."

With regard to his show's reach and influence, Edwards recounts his show's expansion in the section entitled, "Sitting on the Cusp of Greatness." Although in his eyes the show was "quite accomplished" as of October 2006, the show had not reached its potential in terms of listenership. But, in Edwards' words, "This was when Don and Derek Black offered to run the Cesspool simultaneously on their internet radio network, giving the Memphis dynamo access to another legion of loyal listeners. The marriage was a perfect fit." As noted earlier, Don Black was the one-time Grand Wizard of the Knights of the Ku Klux Klan, and his internet radio network is the aforementioned Stormfront.org website that he created.

As for guests and interviewees of the show, Edwards claims that they span the political and ideological spectrum. In his complaint, he asserts that he has interviewed Patrick Buchanan, Lt. Gen Hal Moore, actor Gary Sinise, Dr. Alveda King (the niece of the late Rev. Dr. Martin Luther King, Jr.), legislators, and religious leaders, among others. It does appear from the record that Edwards has interviewed leaders and thinkers with diverse political and ideological viewpoints, some of whom could be considered in the mainstream.

With that said, Edwards makes clear in his show's Statement of Principles that he makes "no attempt to give [listeners] 'both sides.'" He has a strong ideological viewpoint, he voices this viewpoint on the show, and he highlights this through several of the show's frequent guests, including Duke and Sam Dickson, Jr. (Duke's association with the Ku Klux Klan is noted earlier. As for Dickson, he has represented Ku Klux Klan members in court in the past.) Both have been on the radio talkshow dozens of times, and Duke often writes posts for *The Political Cesspool*'s blog, including, among other things, a piece addressing the purported "Jewish extremist takeover of America."

## B. BANKOLE THOMPSON'S OPINION PIECE IN *THE DETROIT NEWS*

On March 17, 2016, *The Detroit News* published an opinion piece by Bankole Thompson in its "Think" section. The piece was entitled, "Jewish leaders fear Trump presidency." The piece centered on concerns expressed by Detroit-area Jewish leaders regarding the involvement

of white supremacists during the 2016 presidential campaign.  In the piece, Thompson made the following assertion:

> Of particular note to some in the Jewish community is the unprecedented support the Trump campaign has received among white supremacist groups like the Ku Klux Klan and its leaders like James Edwards, David Duke and Thomas Robb, the national director of the Knights of the Ku Klux Klan in Arkansas.

## C.  A DEMAND LETTER, A RESPONSE LETTER, AND A PUBLISHED CLARIFICATION

Edwards became aware of Thompson's opinion piece shortly after publication.  Edwards' lawyer, Mr. Kyle Bristow, sent defendants a letter in April 2016 demanding a retraction.  Mr. Bristow asserted that Edwards "is not now, nor has he ever been, associated with the Ku Klux Klan—much less a leader of it."  He further maintained that Edwards "has no criminal history whatsoever, while the Ku Klux Klan is a criminal terrorist organization which has been responsible for beatings, bombings, murders, and other heinous crimes throughout American history."  Thompson's opinion piece constituted libel per se, according to the letter.

Defendants' legal counsel responded in writing several days later.  In that letter, defendants did not argue that Edwards did, in fact, have a formal leadership role with the Ku Klux Klan.  Rather, defendants pointed out that the statement at issue was made in an editorial about the campaign for the presidency, that Edwards invited criticism with his on-air and written views, and that the First Amendment protects political debate.  Without admitting that any reasonable reader would be confused, the letter closed by stating that *The Detroit News* would soon provide a clarification to its readers.

As promised, on April 12, 2016, *The Detroit News* published a clarification in its print and electronic editions, and as-of the date of this opinion, the clarification continues to sit at the beginning of the electronic version of the piece.  The clarification reads in full: "James Edwards, the Memphis-area host of the radio show 'The Political Cesspool' has no formal position with the Ku Klux Klan."  Moreover, the newspaper modified the sentence in question by omitting the word "its."  The sentence now reads in full:

> Of particular note to some in the Jewish community is the unprecedented support the Trump campaign has received among white supremacist groups like the Ku Klux Klan and leaders like James Edwards, David Duke and Thomas Robb, the national director of the Knights of the Ku Klux Klan in Arkansas.

Notwithstanding the clarification, Edwards sued defendants claiming that the original sentence was defamatory and that the clarification did not cure the injury or otherwise make him whole.  Edwards asserted claims of defamation (libel per se), defamation by implication (libel per se), and invasion of privacy (false light).  Defendants moved for summary disposition on all claims under MCR 2.116(C)(8) and (10).  The trial court granted defendants' motion, holding that the term "leader" was inherently ambiguous and the statements in the piece were subjective opinions rather than statements of fact.  Edwards timely appealed as of right.

## I. Analysis

### A. STANDARD OF REVIEW

Defendants moved in the trial court for summary disposition on all three claims under both MCR 2.116(C)(8) and (10). The trial court granted summary disposition, but it did not specify whether under (C)(8) or (10). Because we consider factual matters outside the four corners of the complaint, we will review whether summary disposition was appropriate under MCR 2.116(C)(10).

Summary disposition is appropriate under MCR 2.116(C)(10) when, except as to damages, "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." We construe the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to Edwards as the non-movant. *Latham v Barton Malow Co*, 480 Mich 105, 111; 746 NW2d 868 (2008).

### B. DEFAMATION AND THE FIRST AMENDMENT

The Court will consider simultaneously Edwards' claims of defamation and invasion of privacy given that they share common factual allegations and in light of the protections of the First Amendment. *Battaglieri v Mackinac Ctr for Public Policy*, 261 Mich App 296, 303-304 and n 4; 680 NW2d 915 (2004). When considering a defamation claim, the Court must make an "independent examination" of the facts to make sure that the speaker's First Amendment right of free expression is preserved. *Kevorkian v American Medical Association*, 237 Mich App 1, 5; 602 NW2d 233 (1999).

> To make a claim of defamation, a plaintiff must prove the following:
> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Lakin v Rund*, 318 Mich App 127, 133; 896 NW2d 76 (2016) (internal citation omitted).]

An additional requirement exists when the communication is made with reference to a public figure as opposed to a non-public private individual. With respect to a public figure, the defamatory statement must also have been made with actual malice, not just negligence. *Kevorkian*, 237 Mich App at 9. The parties agree that Edwards is a public figure for purposes of this lawsuit.

Not all defamatory statements, even those made with actual malice, are actionable. The First Amendment protects communications that "cannot be reasonably interpreted as stating actual facts about the plaintiff," i.e., "expressions of opinion are protected." *Ireland v Edwards*, 230 Mich App 607, 614; 584 NW2d 632 (1998). This Court has previously identified several instances of speech that fall within the constitutionally protected class of opinion speech, including: (1) statements that are both objectively verifiable but also necessarily subjective; (2) parodies, political cartoons, satires, and other statements that, while "factual on their face and provable as false, could not reasonably be interpreted as stating actual facts about the plaintiff";

(3) "statements that both do and do not state actual facts about a person"; and (4) expressions of opinion that otherwise "constitute no more than 'rhetorical hyperbole' or 'vigorous epithet,'" such as calling someone a "crook" or "traitor." *Kevorkian*, 237 Mich App at 6-8 (internal citations omitted). As our case law makes clear, the First Amendment provides "maximum protection to public speech about public figures with a special solicitude for speech of public concern." *Id.* at 9 (internal citation, ellipsis, and brackets omitted).

The First Amendment's "maximum protection" is not, however, an absolute bar against a public figure's defamation claim. "Statements that are not protected and therefore are actionable include false statements of fact, i.e., those that state actual facts but are objectively provable as false, and direct accusations or inferences of criminal conduct." *Id.* at 8; see also *Lakin*, 318 Mich App at 138 (identifying the types of criminal accusations that fall within the category of defamation per se).

Simply being a member or an official of the Ku Klux Klan is not, by itself, a criminal act. Therefore, to have an actionable claim, Edwards must show, among other things, that Thompson's communication stated an actual, objectively verifiable factual assertion not otherwise protected under the First Amendment. In this context, if the statement can be understood both to be objectively verifiable but also to mean different things to different people—in other words, the statement is subjective and therefore open to several plausible interpretations—then the statement is not actionable.

## C. WHO IS A "LEADER"?

Turning to the statement at issue—"white supremacist groups like the Ku Klux Klan and its leaders like James Edwards, David Duke and Thomas Robb, the national director of the Knights of the Ku Klux Klan in Arkansas"—defendants do not dispute that the possessive pronoun "its" refers to "the Ku Klux Klan" and not "white supremacist groups." If, in fact, "its" had referred to "white supremacist groups," then even Edwards admits he would not have a viable claim, as he has conceded on appeal that calling him a "white supremacist" would not be defamatory.

Defendants' position makes sense for two reasons. First, "its" is singular and therefore grammatically it is consistent with the singular "Ku Klux Klan" and not with the plural "white supremacist groups"—otherwise, "their" would have been the more appropriate possessive pronoun. Second, when defendants published the clarification, they also edited the opinion piece by deleting "its" and thereby making "leaders" stand on its own, without grammatical relation to either "white supremacist groups" or "the Ku Klux Klan." It is doubtful that defendants would have made this change had "its" referred to something other than "the Ku Klux Klan." Thus, it appears clear that in his original opinion piece, Thompson described Edwards as a "leader" of the Klan, and we must determine whether this assertion is actionable under the circumstances.

As noted earlier, defendants do not argue, and there is no record evidence to suggest, that Edwards holds or has held an official leadership role with the Klan or even that he was ever a member of the organization. In Edwards' view, these uncontested facts are dispositive, as he contends that the meaning of the term "leader," when referring to a formal group, necessarily implies membership in that group. He takes support from the fact that both Duke and Robb have

held official leadership roles with Klan groups in the past. Under something akin to the canon of construction that a court should interpret a general term in light of the more specific ones in a series, Edwards argues that a reader would necessarily presume that he had an official affiliation with the Ku Klux Klan because both Duke and Robb did.

We find this argument unconvincing for several reasons. Initially, we note that in newspaper editorials and opinion pieces, a reasonable reader "expects to find the opinions and biases of the individual writers," *Garvelink v Detroit News*, 206 Mich App 604, 611; 522 NW2d 883 (1994), whereas in statutes or contracts, such opinions and biases are not similarly expected. Given this, and for a myriad of other reasons, a court should not hold an opinion piece in a newspaper to the same grammatical rigor as a statute or contract.

And this leads to a second, crucial point—it is undeniable that there are multiple accepted definitions of the term "leader," and they are not nearly as constrained as Edwards would have us believe. *The Oxford English Dictionary* (2nd ed.) (1989) lists in relevant part the following definitions of the term: "One who conducts, precedes as a guide, leads a person by the hand"; "One who leads a body of armed men; a commander, a captain"; "One who guides others in action or opinion; one who takes the lead in any business enterprise or movement"; "one who is 'followed' by disciples or adherents; the chief of a sect or party"; "The foremost or most eminent member (of a profession); also, in a wider sense, a person of eminent position and influence." For its part, the term "member" is defined as: "Each of the individuals belonging to or forming a society or assembly."

Edwards is correct in the narrow sense that one meaning of "leader" includes being "[t]he foremost or most eminent member" of a group. Thus, one plausible inference could be that Edwards, like Duke and Robb, had an official role with the Ku Klux Klan. Yet, Edwards is incorrect in a more fundamental sense because the term can be used and understood more broadly—e.g., a leader may be someone who "guides others in action or opinion," "one who takes the lead in any . . . movement," "one who is 'followed' by disciples or adherents," or "in a wider sense, a person of eminent position and influence." None of these latter meanings necessarily imply official affiliation with a particular group.

Considering the multiple meanings that "leader" can have, we do not read the sentence to imply necessarily that Edwards must have held some official, designated leadership role in the Ku Klux Klan. Certainly, Edwards is correct that this could be one plausible interpretation. Yet, the sentence was part of a newspaper opinion piece, not a statute or contract, and just because the other two cited individuals once held office in the Klan, it does not logically follow that a reasonable reader would necessarily have to infer that the third listed individual also held office in the Klan. Another interpretation could be that Edwards was an opinion leader, one with position and influence over those who have sympathies for the Klan or who are actual members of the Klan.

Edwards' own words and deeds lend plausibility to this latter interpretation. As recounted earlier, his radio show and website are replete with references to "pro-White" sentiments. One of his stated principles is to "grow the percentage of Whites in the world relative to other races," and he favorably cites opinions that intermarriage and immigration

constitute a "genocide" against "European Americans." Moreover, Edwards goes beyond "mere" white nationalism and ventures into even more extreme territory. For example, Edwards refers on several occasions to non-white persons in derogatory terms (e.g., "black malcontents"). Likewise, Duke and Dickson are frequent guests on the radio show, and both have past associations with the Ku Klux Klan. In fact, Edwards has embraced Duke to such an extent that the two are repeatedly photographed together, and Duke is a frequent writer of blog entries on the radio show's website.

Most critically, Edwards himself has embraced those listeners who are interested in extreme forms of racism, white supremacy, anti-Semitism, and nativism. Specifically, Edwards publicly celebrated the fact that beginning in 2006, his radio show would be carried on the "internet radio network" (i.e., Stormfront.org) operated by Don Black, a person long associated with the Klan and with extremist views on race and ethnicity, and that this would give Edwards' radio show "access to another legion of loyal listeners" and was, in his estimation, a "perfect fit."

Similar to Dr. Kevorkian and the debate on assisted suicide, see *Kevorkian*, 237 Mich App at 13-14, Edwards has sought to inject himself into the national debate on racism and ethnicity. He has staked out some extreme positions, has publicly eschewed giving his listeners "both sides" of the debate, and has enthusiastically embraced several individuals, including Duke, Black, and Dickson, who are publicly associated with the Ku Klux Klan. Edwards may not believe that he is a leader of the Ku Klux Klan, but it is plausible that a reader of the statement who was also aware of Edwards' views and associates could conclude otherwise.

Edwards did not discuss or even cite this Court's controlling *Kevorkian* decision on defamation in either of his appellate briefs. Instead, he asks that we follow the Supreme Court of Montana's decision in *Roots v Montana Human Rights Network*, 275 Mont 408; 913 P2d 638 (1996). We decline the invitation to do so, given that *Roots* is not binding precedent in Michigan and the facts in that case are materially different from those here. For example, the plaintiff in *Roots* was not labeled a "leader" of the Ku Klux Klan, but rather an "organizer" of the group, which calls to mind a more specific relationship with the group. Moreover, the assertion was made in a booklet, not a newspaper opinion piece, and there was a question of fact whether the plaintiff was a public figure. These and other differences make *Roots* not particularly persuasive in this case.

Our reading that defendants' statement is necessarily subjective gains further support from the only other judicial decision cited by the parties or found in our research involving the meaning of "leader" in the context of a defamation claim. In *Egiazaryan v Zalmayev*, 880 F Supp 2d 494 (SDNY, 2012), the plaintiff sued the defendant for defamation based on several communications, including the assertion that he was a "leader" of a Russian political party that had strong anti-Semitic and xenophobic strands. The federal district court noted that the assertion was an expression of opinion, not fact. The court also focused on the context of the statement:

> When used in political discourse, terms of relation and association often have meanings that are "debatable, loose, and varying," rendering the relationships they describe insusceptible of proof of truth or falsity. The word "leader" has a

debatable, loose and varying meaning when used to describe the relationship of a prominent politician to the political party he overtly represents. Egiazaryan is an admittedly "prominent" former banker who assumed managerial roles in the Duma while occupying an LDPR seat there for over a decade. Given the vagueness of the word "leader" in this context, and given Egiazaryan's admitted prominence and overt association with the LDPR, the assertion that he is a "leader" of the LDPR is a non-provable opinion. [*Id.* at 512 (internal citation omitted).]

The federal district court concluded that the assertion was a "non-provable opinion." Under the framework our Court set out in *Kevorkian*, we arrive at a similar conclusion. In the context of an opinion piece about a crucially important topic—the 2016 presidential campaign—defendants' use of the term "leader" was ambiguous and could plausibly be understood to mean different things to different readers. The term could be understood to mean that Edwards had an official leadership position with the Ku Klux Klan, like Duke and Robb had. Alternatively, the term could be understood to mean that Edwards was someone who guided "disciples or adherents" of the Ku Klux Klan "in action or opinion" or that, "in a wider sense," Edwards was "a person of eminent position and influence" to the Ku Klux Klan and its sympathizers. Or, a reader could simply assume that Thompson and *The Detroit News* were unacceptably biased in their political leanings and reject outright the assertions and arguments made in the opinion piece. Any of these, and likely others, would be plausible readings of defendants' opinion piece. Given this, defendants' use of the term "leader" was both "necessarily subjective" and "objectively verifiable," and, therefore, the statement, even if otherwise defamatory, was not actionable under Michigan law. *Kevorkian*, 237 Mich App at 5-6, 13-14.

Because we find that defendants' statement is protected opinion speech, we do not address defendants' other arguments that the statement was substantially true or that Edwards is libel proof.

III. CONCLUSION

As a radio show host, the First Amendment protects Edwards' right of free speech. But similarly, the First Amendment also protects defendants' right of free speech. As explained here, defendants made a statement in a newspaper opinion piece that, given Edwards' expressed views and his close associates, necessarily could be interpreted in different ways by different readers—in other words, the statement is inherently imprecise and indefinite and thus open to several plausible interpretations rather than provably true or false. The statement is, therefore, protected opinion speech.

Accordingly, there is no genuine issue of material fact on Edwards' defamation and invasion of privacy claims. We affirm the trial court's grant of summary disposition in favor of defendants, and as the prevailing parties on appeal, defendants may tax costs.


/s/ Brock A. Swartzle
/s/ Elizabeth L. Gleicher
/s/ Karen M. Fort Hood