*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JOHN MACAULEY BURKMAN,

      Defendant-Appellant.

FOR PUBLICATION
December 13, 2024
10:53 AM

No.  356600
Wayne Circuit Court
LC No.  20-004636-01-FH

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JACOB ALEXANDER WOHL,

      Defendant-Appellant.

No.  356602
Wayne Circuit Court
LC No.  20-004637-01-FH

ON REMAND

Before:  LETICA, P.J., and REDFORD and RICK, JJ.

LETICA, P.J.

-1-

These consolidated appeals[1] return to us on remand from our Supreme Court[2] with the direction to consider whether defendants'[3] conduct in disseminating a robocall pertaining to mail-in voting falls within the limited construction test created to remedy MCL 168.932(a)[4] as unconstitutionally overbroad and to address any remaining constitutional arguments. After completing that review, we continue to affirm the trial court's denial of defendants' motions to quash.

## I. FACTUAL AND PROCEDURAL HISTORY

The following factual and procedural history was delineated in our prior opinion:

> Derrick Thomas was a retired firefighter, resident of the city of Detroit, and registered voter. As a regular voter, Thomas received "robocalls," i.e., prerecorded phone messages disseminated to a large group of people via a computer or robot. Thomas had telephone service through both a landline at his home and a cell phone. Thomas had placed himself on a do-not-call list several times, but it did not stop unsolicited calls to his home. His landline phone had a 313 area code, caller identification, and the ability to simultaneously record a message and play it aloud as it was recorded. On August 26, 2020, at 11:16 a.m., Thomas did not answer a phone call to his landline from a phone number he did not recognize. Still, he heard the message that was left as it was recorded:
>
> > Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The [Centers for Disease Control and Prevention (CDC)] is even pushing to use records from mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man. Stay safe and beware of vote by mail.

---

[1] *People v Burkman*, unpublished order of the Court of Appeals, entered November 9, 2021 (Docket Nos. 356600 and 356602).

[2] *People v Burkman (Burkman II)*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 164638).

[3] We collectively refer to John Macauley Burkman and Jacob Alexander Wohl as defendants. When necessary, we refer to them individually by their last names.

[4] MCL 168.932(a) criminalizes, as a felony, interference with an elector in the following manner:

A person shall not attempt, by means of bribery, menace, or other corrupt means or device, either directly or indirectly, to influence an elector in giving his or her vote, or to deter the elector from, or interrupt the elector in giving his or her vote at any election held in this state.

The message upset Thomas because he believed it was designed to act as "a deter[r]ent from mail-in voting." Although Thomas did not believe that his direct physical safety was threatened, indirectly, he felt concerned about his safety because politics were polarizing. Thomas found the message offensive because it indicated that voting information would be used to allow the police to determine if an individual had any bench warrants, allow credit card companies to learn if an individual had any outstanding debts, and allow the CDC to force an individual to get vaccinated. Thomas felt appalled more than threatened by the message because it deterred mail-in voting during a pandemic when voting in-person was not as safe.

Thomas tried to notify the Detroit Election Commission about the phone call and message but was unable to speak to a person. Thomas then called a local news radio station, and he was interviewed for a story. He played the recorded message for the station employee and gave consent to have the radio station record the message.

As a result of the radio interview, Thomas was contacted by the Department of Attorney General (the Department). Thomas did not have firsthand knowledge about whether there was any truth to the contents of the message. He did not allow himself to be affected by the message and voted by mail.

The Department assigned Jeffrey Campbell the task of investigating the robocall. Campbell learned that the robocall was sent by a company called Message Communications, operated by Robert Mahanian. Additionally, the investigation determined that defendants paid to have the robocall sent by Mahanian's company and were responsible for the robocall's content. Through search warrants, Campbell obtained e-mail exchanges between defendants, and because of the volume of the e-mails, Campbell had not yet reviewed all of them at the time of the preliminary examination. In the e-mails Campbell had read, defendants discussed how to "hijack" this "boring" election. On August 19, 2020, Burkman wrote to Mahanian and copied Wohl that the checks paying for Mahanian's services had been sent in a "two[-]day pouch," and once they arrived, "then we attack." On August 22, 2020, defendants communicated to Mahanian that they were ready to begin the robocalls and that the payment had been mailed.

On August 25, 2020, Wohl e-mailed Burkman that the audio file of the robocall was attached. Wohl further suggested that the robocall be sent "to black neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta and Cleveland." In response, Burkman suggested that the robocall be sent to "[Cleveland], Philadelphia, Minnesota, Chicago, New York City and Detroit." It was determined that the robocalls would be sent in "two waves" consisting of 267,000 calls in each wave.

On August 26, 2020, Mahanian notified defendants that their "campaign is currently running and recording." Defendants exchanged e-mails that the robocalls were being discussed on the Twitter platform. On August 26, 2020, at 12:36 p.m., Burkman wrote to Wohl to comment on the success of the robocalls, stating, "I love

these robo calls getting angry black call backs, win or lose, the black robo calls was [sic] a great idea."

On August 27, 2020, Wohl seemingly wrote Burkman that they should deny sending the robocalls because it would generate more written discussion. Indeed, in response to a writer from a political news and opinion website, Burkman wrote, "[W]e have no connection to those robo calls." A short time later, Burkman addressed the same writer, stating:

> [C]ouple points, one, no one in their right mind would put their cell [phone number] on [the] robo call. I bet a [George] Soros Group is trying to embarrass us. Thirdly, we have been asked by the Trump Campaign to do robo calls and politely declined. We don't do that stuff.

Additionally, a member of the Associated Press wrote Burkman and asked if defendants were involved in the robocall. Burkman wrote back, "[N]o sir, not at all . . . ." However, on October 26, 2020, Burkman presented at a federal court hearing in New York and acknowledged that defendants had prepared and caused the robocall message to be sent. At the same hearing, Wohl affirmed the statement made by Burkman.

Campbell was asked by Burkman's counsel whether there was other evidence that his client desired to deter mail-in voting. Although Campbell had not completed his review of the e-mails, he responded there were e-mails "between [defendants] discussing other plans to influence the election by creating false schemes, hiring actors to create false allegations and so forth." When asked to provide an opinion regarding the nature of the e-mail between defendants, Campbell responded that "one of their intentions [was] to influence the election unfairly" and to deter mail-in voting. He acknowledged that the e-mails did not discuss in-person voting.

During Campbell's investigation, he learned that defendants had uploaded the content of the robocall. Furthermore, defendants, not Mahanian, chose the *zip codes* where the robocall was deployed. Campbell had no evidence that Mahanian altered the content of the robocall presented by defendants, and Mahanian kept detailed records addressing client involvement and content history.

Khyla Craine, an attorney, served as the second in command of the Legal Services Administration, which included the Bureau of Elections, within the Michigan Department of State and provided legal and policy consultations. Craine also was the Chief Privacy Officer and addressed data-related questions. Craine described a robocall as "[a]n automated [message] dialed to a group of residents that will encourage them to do something, usually tied to [an] election, but it could be for any purpose[.]" Craine was made aware of this particular robocall in late August or early September 2020. There was an accusation "that it would be [a]

-4-

voter suppression type of robo call targeted [at] African American citizens in the City of Detroit." Craine heard the robocall in October 2020.

Craine testified that information related to elections was part of a public record. However, there were search limitations on the record. She opined that the robocall's content regarding access to voter records by law enforcement, credit card agencies, or the CDC was false. A state election file contained the voter's name, address, participation in an election, and type of vote cast, i.e., mail-in or in-person. This information could be shared publicly. However, state law prohibits the voter's phone number or e-mail address from being shared. Because the qualified voter file contained limited data that did not include contact information, it did not make sense that law enforcement or credit card agencies would use this compiled material. Moreover, there were other compiled databases that law enforcement and credit card agencies used that contained the information they required for their work. For example, the driver information file provided companies more details than the qualified voter file. The Law Enforcement Information Network system was the database used by police agencies to achieve their objectives. Craine was unaware of any voting information requested by or given to the CDC, and she was unaware of any mandated vaccinations as stated on the robocall. Even Craine did not have access to the qualified voter files because the access was given on a need-to-know basis, and the recipients that received these files were vetted by the Bureau of Elections. Thus, Craine opined that law enforcement did not have access to the qualified voter file unless there was an investigation into an elections-related offense. Further, it was not used by credit card companies to collect outstanding debts. Thousands of entities request information from the driver files, not the qualified voter files. Craine opined that voters had no reason to be concerned about mail-in voting, but she "would have a concern if [voters] listened to this robo call and got misinformation [that affected] whether or not . . . they would feel that mail[-]in voting was safe."

On cross-examination, Craine stated that a person or entity could not request the personal information of an individual voter from the qualified voter file. However, a person or entity could request this information for a group of voters, such as those registered in a specific jurisdiction, zip code, or house district. Furthermore, if debt collection was the reason for seeking this information, as implied in the robocall, other databases provided more suitable information. Craine affirmed that she was offended by the robocall because the state had the "responsibility . . . to [e]nsure that all of our voters are able to vote without any type of issue and that they're not intimidated or given misinformation about the accuracy or security of their ballot." Also, on cross-examination, Craine again opined that the information contained in the robocall was false. Although Craine did not call the CDC to determine if it would seek to access voter files, there were no mandated vaccinations at that time.

Craine also never sought out defendants to inquire about their reason for the robocall. But, if they were motivated by concern over mail-in ballots, Craine found it curious that defendants only directed the robocall to Detroit residents rather than

cautioning citizens across the state of Michigan about mail-in voting. In Craine's experience addressing voter suppression, the robocall fit into the pattern of misinformation that is directed to select individuals in a particular jurisdiction. When it was proffered that defendants' purchase of information pertaining to the 313 area code of Wayne County included suburban communities that were "highly Caucasian," Craine maintained that Wayne County remained "disproportionately African American." Again, Craine testified that defendants appeared to target a particular group of people, not just general voters, in light of the fact that the robocall was disseminated to a limited area and not the entire state. Further, she opined that the use of phrases such as "mandatory vaccinations" and "the man" was verbiage directed to a particular group of people. Because the robocall attempted to deter mail-in voting and COVID-19 had disproportionately affected African Americans in Detroit, Craine concluded that suppression of the vote was the logical objective of the call in light of the combination of factors. In the 18 months that Craine had worked in her position, the police, credit card agencies, and the CDC had never used the qualified voter files.

At the conclusion of this testimony, defendants opposed the bindover, alleging that the statute did not govern the message at issue or did not clearly define the conduct it governed and that the message at issue contained speech that was protected by the First Amendment. The prosecution asserted that it presented sufficient information to support the elements and that the speech at issue was not protected.

The district court concluded that the crimes alleged were committed in the city of Detroit and that there was probable cause to believe that defendants committed them. The district court noted Craine's testimony that law enforcement, credit card companies, and the CDC did not access the qualified voter files to contact people or to execute their duties. It was also noted that defendants disseminated the call to a particular group of people in light of defendants' "very strong political views," and the appropriate inquiry was not the effect of the message on the recipient, but defendants' intent. The district court also stated that the message was directed to a community that was 85% African American, and this community equated the term "the man" to "the white man."

In the circuit court, defendants moved to quash the bindover. First, defendants argued that MCL 168.932(a) did not criminalize their conduct because they did not engage in acts of physical harm. Second, defendants submitted that MCL 168.932(a) was unconstitutional on its face and as applied and that their conduct was protected by the First Amendment. The prosecution opposed the motion, alleging that defendants' actions were criminal and in violation of MCL 168.932(a) because they sent a threatening message designed to deter individuals from voting and arguing that a threat need not be physical to violate the statute. The prosecution further alleged that the message was not protected by the First Amendment because it was a true threat and there was a need to protect the right to vote.

After hearing oral argument, the trial court rejected defendants' arguments. The trial court concluded that the district court did not abuse its discretion in binding defendants over in light of the content of the message, the e-mails exchanged between defendants regarding their desire to "hijack" the election, the community to which the message was directed, and the circumstances surrounding the pandemic as residents were encouraged to stay home. The trial court also rejected the contention that the prosecution violated defendants' First Amendment rights, noting that the state had a compelling interest in protecting the right to vote and that the Legislature had narrowly tailored MCL 168.932 to prevent any attempt to influence the vote or deter a vote. Moreover, the trial court characterized the message as not expressing an opinion, but presenting misleading and possibly false information. [*People v Burkman (Burkman I)*, 341 Mich App 734, 739-748; 992 NW2d 341 (2022).]

A majority of this Court rejected defendants' request to conclude that the robocall was not menacing because it failed to include a physical threat by the speaker, that the robocall message did not constitute a "corrupt means or device," and that it unconstitutionally criminalized speech. *Id*. at 752-758, 763-764.

But, our Supreme Court concluded that defendants' conduct did not constitute a "menace" under MCL 168.932(a) because menace "requires that the person making the threat will be the party who performs the threat or causes the threat to be performed." *People v Burkman (Burkman II)*, ___ Mich ___; ___ NW3d ___ (2024) (Docket No. 164638); slip op at 14. And, the Court determined that the prosecutor could proceed on the theory of "other corrupt means or device," stating:

> [W]e interpret the statutory language "other corrupt means or device" as any other depraved or immoral method or scheme of deterring or preventing someone from voting or influencing or interrupting someone in giving their vote. Under this definition, we conclude that there is probable cause to believe that defendants violated MCL 168.932(a). The prosecutor presented sufficient evidence to cause a person of ordinary prudence and caution to entertain a reasonable belief that defendants attempted to deter Black metro-Detroiters from voting in the 2020 election by the immoral or depraved method of spreading misinformation regarding the consequences of voting and that defendants did so with racially based motives. Defendants discussed their desire to "hi-jack this boring election" and arranged for the distribution of a robocall specifically to "black neighborhoods" with the call stating that the consequences of mail-in voting would include voter information being used by police departments to effectuate old warrants, by credit card companies to collect outstanding debts, and (potentially) by the CDC to support mandatory vaccination efforts—information that Deputy Legal Director Craine testified was untrue. Defendants expressed pleasure in receiving "angry black call backs" regarding the message, and they initially denied their involvement when contacted regarding the robocall. Given the targeted nature of the robocall, defendants' e-mails, and the content of the robocall, one could reasonably believe that the robocall was a depraved attempt to deter Black electors from voting in the 2020 election. To the extent that questions may remain regarding defendants'

-7-

intentions in distributing the robocall and whether the information in the robocall was false, we would emphasize that a bindover requires only that an ordinary person would entertain a reasonable belief of guilt, and that standard has been met here. [*Burkman II*, ___ Mich at ___; slip op at 18-19 (footnotes and citations omitted).]

When addressing the challenge to the constitutionality of MCL 168.932(a) in light of the First Amendment, US Const, Am I, our Supreme Court acknowledged that restriction of speech was permissible under the true threats exception but affirmed this Court's conclusion that it was inapplicable here. *Burkman II*, ___ Mich at ___; slip op at 22-26. And, the Court declined to apply the speech-integral-to-criminal-conduct-exception to defendants' conduct in this case. *Id.*; slip op at 28.

After addressing those two proposed exceptions to the constitutional protections of free speech, our Supreme Court rejected the contention that MCL 168.932(a) was unconstitutionally vague "because the plain-language interpretation of the statutory terms . . . provide fair notice of the conduct being proscribed and prevent arbitrary and discriminatory enforcement of the law." *Burkman II*, ___ Mich at ___; slip op at 29. But, it held "that the statute's catchall 'or other corrupt means or device' is unconstitutionally overbroad because it poses a 'realistic danger' of infringing constitutional free-speech protections." *Id.*; slip op at 31. Yet, the Court determined that invalidation should be avoided when premised on overbreadth, and it offered a limited construction of MCL 168.932(a)'s catchall "other corrupt means or device" language as a remedy. Specifically, the Court held that "when the charged conduct is *solely* speech and does not fall under any exceptions to constitutional free-speech protections, MCL 168.932(a)'s catchall phrase operates to proscribe that speech only if it is intentionally false speech that is related to voting requirements or procedures and is made in an attempt to deter or influence an elector's vote." *Burkman II*, ___ Mich at ___; slip op at 33. In so holding, the Court cautioned that "[i]ntentionally false speech about voting requirements or procedures serves no purposes other than defrauding electors with respect to their franchise." *Id.*; slip op at 34 (citation omitted). Accordingly, our Supreme Court remanded the matter for our analysis of the limiting construction of MCL 168.932(a)'s catchall phrase and to resolve defendants' remaining constitutional arguments.[5]

## II. STANDARD OF REVIEW

The following standards of review are applicable:

In the context of reviewing a district court's bindover decision, the order on appeal is the circuit court's decision denying the motion to quash, which we review de novo (i.e., with no deference) because the dispositive question is whether the district court abused its discretion in binding over defendants. *People v Norwood*, 303 Mich App 466, 468; 843 NW2d 775 (2013); *People v Redden*, 290 Mich App

---

[5] On remand, we allowed the parties to submit supplemental briefs and to appear for oral argument. See respectively *People v Burkman*, unpublished order of the Court of Appeals, entered July 22, 2024 (Docket Nos. 356600 and 356602); *People v Burkman*, unpublished order of the Court of Appeals, entered September 17, 2024 (Docket Nos. 356600 and 356602).

65, 83; 799 NW2d 184 (2010). Thus, although we give no deference to the circuit court's findings in its review of the district court decision, we give a great deal of deference to the *district court's* decision; that is, we review that decision for an abuse of discretion. See *People v Zitka*, 325 Mich App 38, 43-44; 922 NW2d 696 (2018).

> "At its core, an abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *People v Anderson*, 501 Mich 175, 189; 912 NW2d 503 (2018) (quotation marks and citation omitted). "An abuse of discretion occurs when a decision falls outside the range of reasonable and principled outcomes, and a trial court necessarily abuses its discretion when it makes an error of law." *Zitka*, 325 Mich App at 43-44 (quotation marks, citations, and brackets omitted). "However, '[t]o the extent that a lower court's decision on a motion to quash the information is based on an interpretation of the law, appellate review of the interpretation is de novo.' " *People v Bass*, 317 Mich App 241, 279; 893 NW2d 140 (2016), quoting *People v Miller*, 288 Mich App 207, 209; 795 NW2d 156 (2010). [*People v Crumbley*, 346 Mich App 144, 166-167; 11 NW3d 576 (2023).]

With respect to the "interpretation of constitutional issues," a lower court's decision is "reviewed de novo." *People v Butler*, 513 Mich 24, 29; 6 NW3d 54 (2024).

## III.  ANALYSIS

As noted above, on remand, we must first "decide whether defendants' conduct falls within the limiting construction of MCL 168.932(a) . . . ." *Burkman II*, ___ Mich at ___; slip op at 34.[6] This construction applied "when the charged conduct is *solely* speech and does not fall under any exceptions to constitutional free-speech protections . . . ." *Id*. at ___; slip op at 33.  The parties do not dispute such is the case here.

---

[6] In context, defendants' appeals challenged the denial of their motions to quash.  Our Supreme Court created a new limiting construction of the catchall exception in MCL 168.932(a) but did not remand the matter to the district court for its application.  In light of the witnesses that testified at the preliminary examination, we conclude that there is sufficient factual development in the record to conduct this analysis and a remand to the district court is unnecessary.

This instruction from the Court also precludes defendants' argument that applying the limiting construction to their case would cause a fair-notice issue, which was made on the basis of Justice ZAHRA's dissent. *Burkman II*, ___ Mich at ___ (ZAHRA, J., dissenting); slip op at 17.  The majority opinion is binding, and it instructed this Court to apply the limiting construction to defendants' case. *Burkman II*, ___ Mich at ___(opinion of the Court); slip op at 34.  Therefore, defendants' reliance on the assertion in the dissent is misplaced when it is directly contradicted by the majority.

The *Burkman II* Court created a limited construction, stating: "MCL 168.932(a)'s catchall phrase operates to proscribe that speech only if it is intentionally false speech that is related to voting requirements or procedures and is made in an attempt to deter or influence an elector's vote." *Burkman II*, ___ Mich at ___; slip op at 33. The limitation essentially consists of three elements: (1) the speech at issue "is intentionally false," (2) the speech "relate[s] to voting requirements or procedures," and (3) the speech "is made in an attempt to deter or influence an elector's vote." *Id*. The parties agree the third element is not in dispute because our Supreme Court determined that, in light of all the evidence admitted at the preliminary examination, "one could reasonably believe that the robocall was a depraved attempt to deter Black electors from voting in the 2020 election." *Id*. at ___; slip op at 19. Consequently, we address the first two elements.

The parties dispute whether the robocall was intentionally false. Defendants urge us to apply a narrow interpretation of false and that "intentionally false" should be read to mean empirically false, resulting in dismissal of the charges against them. On the contrary, the prosecutor contends that the issue of falsity was previously decided in *Burkman I*, 341 Mich App at 756-757, and *Burkman II*, ___ Mich at ___; slip op at 19.

In *Burkman II*, when addressing whether defendants engaged in a "depraved or immoral method or scheme," the Court explained there was probable cause to believe defendants were "spreading *misinformation* regarding the consequences of voting . . . ." *Id*. at ___; slip op at 18 (emphasis added). And later, the Court commented: "To the extent that questions may remain regarding defendants' intentions in distributing the robocall and whether the information in the robocall was false, we would emphasize that a bindover requires only that an ordinary person would entertain a reasonable belief of guilt, and that standard has been met here." *Id*. at ___; slip op at 19. In light of this bindover standard, there was probable cause to conclude that the message was false. The content of the robocall indicated mail-in voting "sounds great," but voting by mail would result in placement on a public database that would be used by law enforcement to arrest individuals with outstanding warrants, used by credit card agencies to collect outstanding debts, and used by the CDC to impose mandatory vaccines. But, the qualified voter file did not contain the voter's phone number and e-mail address that was available in other public databases such as the driver information file. To Craine's knowledge, law enforcement and credit card agencies had not used mail-in voting information for purposes of arrest and debt collection. Further, the Bureau of Elections vetted the entities that requested the qualified voter files. Thus, there was no indication that voting by mail resulting in the creation of a public database was used by law enforcement or credit card agencies, contrary to the content of the robocall.

Further, the issue of intentional falsity generally presents an issue for the jury when sufficient evidence was presented at the preliminary examination. See *People v Hoag*, 89 Mich App 611, 617-619; 281 NW2d 137 (1979). The *Burkman II* Court's addition of the word "intentional" does not equate with empirical falsity. Instead, intentional falsity focuses on defendants' state of mind and knowledge, not on empirical data or facts. See *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020) (emphasis added) ("Because it can be difficult to prove a defendant's *state of mind* on issues such as *intent*, minimal circumstantial evidence suffices to establish a defendant's state of mind."). Indeed, testimony is not necessarily "intentionally false" when the speaker "truly, subjectively believed that what she" said was true, or there was no evidence "provided to suggest that such a belief was factually unreasonable based on other

-10-

knowledge that she had . . . ." *In re Green*, 512 Mich 533, 557; 999 NW2d 683 (2023). But, a defendant may make an intentional misrepresentation or a misleading statement when it is contradicted by other evidence in the case. *Id*. at 558-559 (citation omitted). Therefore, in determining whether speech was intentionally false under the limited construction of MCL 168.932(a), the proper focus is on whether defendants knew it was false when they said it. *In re Green*, 512 Mich at 557. As in all criminal cases involving a defendant's state of mind, which is implicitly difficult to prove, "minimal circumstantial evidence suffices to establish" it. *Kenny*, 332 Mich App at 403.

On remand, we have been instructed to determine, in part, whether the robocall was intentionally false. *Burkman II*, ___ Mich at ___; slip op at 34. Notably, the subject matter of the appeal was the denial of defendants' motions to quash the bindover. Therefore, this Court has not been tasked to determine, as a matter of law, whether the statements were actually intentionally false, but whether there was "probable cause to believe that" defendants' statements were intentionally false. *Id*. at ___; slip op at 7.[7] "Probable cause requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Id*. (quotation marks and citation omitted).

We conclude there was sufficient circumstantial evidence at the bindover to establish probable cause that defendants knew the robocall contained false information. Once the Department learned of the robocall, it assigned Jeffrey Campbell to research the matter. Campbell's investigation revealed that defendants paid for and submitted the robocall's content to a communications company for distribution. Defendants exchanged e-mails in which they discussed how to "hijack" the boring election. They discussed the location where the robocalls would be sent, and their objective was to send it to "black neighborhoods" in various cities, including Detroit. Defendants addressed the success of the robocalls, noting that the calls were being discussed on social media and that they were receiving angry phone calls from their target audience. To precipitate further discourse, defendants decided to deny any participation in or connection to the robocalls to political news and opinion writers. At the time of Campbell's

---

[7] This defeats defendants' claim that this Court must reverse and remand with instructions to dismiss if it determines there is a factual dispute regarding intentional falsity. Once again, defendants contend that, to do otherwise, would unacceptably harm the exercise of free speech. But, our review of *Burkman II* belies this argument. Indeed, in the opinion, when discussing proof of defendants' state of mind and the falseness of the robocall, the Court specifically "emphasize[d] that a bindover requires only that an ordinary person would entertain a reasonable belief of guilt . . . ." *Burkman II*, ___ Mich at ___; slip op at 19. The Court did not state or conclude the issue of intentional falsity had transformed into a legal question to be decided by appellate courts as a matter of law. Indeed, the Court has long held intent is an issue of fact for a jury to decide, and did not impliedly remove the question from the realm of the fact-finder as asserted by defendants. See *People v Haveman*, 328 Mich App 480, 491-492; 938 NW2d 773 (2019), citing *Roberts v People*, 19 Mich 401, 414 (1870) ("[W]hen a statute makes an offense to consist of an act combined with a particular intent, that intent is just as necessary to be proved as the act itself, and must be found by the jury, as matter of fact, before a conviction can be had.") (quotation marks and citation omitted.).

testimony, he had not completed his review of defendants' communications, but noted that they discussed further fraudulent activities, such as hiring actors to raise false allegations. Campbell opined that the nature of the e-mails between defendants reflected the intent to unfairly influence the election and deter mail-in voting.

Additionally, Craine opined that the content of the robocall was false. Specifically, the state's election file contained the voter's name, address, election participation, and whether the vote was cast by mail or in-person. But, a voter's phone number and e-mail address was not shared in the qualified voter file. Therefore, law enforcement and credit card agencies were more apt to obtain the driver information file or use the Law Enforcement Information Network to achieve their objectives. And, Craine was unaware of the CDC ever seeking access to voter files, and noted that vaccines were not mandatory. Furthermore, the Bureau of Elections vetted entities that requested qualified voter files because access was given on a need-to-know basis. Craine insisted that she was unaware of the police, credit card companies, or CDC even accessing the qualified voter file.

Both Craine and Detroit voter Derrick Thomas indicated that the timing of the robocall, during a pandemic, and its misinformation content was designed to deter mail-in voting by indicating it was unsafe. This evidence was sufficient to establish probable cause that the robocall statements were false. Further, because there was no evidence in the record to suggest that the allegations in the robocall ever occurred, it could be inferred that defendants knew the robocall contained lies. Stated differently, because the robocall asserted certain things "will" happen, such as the police and credit card companies using the information to track down warrants and bad debts, and those things had never happened, one could infer defendants crafted the statements knowing they were not true. This inference is permissible particularly when defendants designed the robocall to "hijack" the election, to send the robocall to black neighborhoods, and to consider other actions, including hiring actors to generate other false stories. Defendants expressed satisfaction when the robocalls generated angry calls from the black communities they targeted. And, Burkman deliberately gave interviews denying any connection to the robocalls.[8] "A jury may infer consciousness of guilt from evidence of lying or deception." *People v Unger*, 278 Mich App 210, 227; 749 NW2d 272 (2008). In other words, because defendants lied about distributing the robocalls, it was reasonable to infer they knew what they were doing was wrong. *Id*.

In light of the preliminary examination testimony and because intent is difficult to prove and requires only minimal circumstantial evidence, *Kenny*, 332 Mich App at 403, there was "a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief" that the robocall contained intentionally false speech, *Burkman II*, ___ Mich at ___; slip op at 7 (quotation marks and citation omitted). Because

---

[8] The prosecutor requests that we take judicial notice under MRE 201 of defendants' convictions of criminal charges in Ohio and their statements at sentencing, apparently acknowledging responsibility for the robocalls and expressing remorse. The preliminary examination testimony of Thomas, Campbell, and Craine contains sufficient evidence to support probable cause that the robocall content was intentionally false. We express no opinion regarding the admissibility of such evidence at a trial.

there was probable cause to support the intentional falsity element, the trial court's order denying the motion to quash was not erroneous on that ground. *Id*.

Next, we must address whether the robocall was "related to voting requirements or procedures . . . ." *Id*. at ___; slip op at 33. Both parties focus on the propriety of voting procedures, indicating that the robocall was not related to voting requirements. Defendants contend the limiting construction test requires the robocall to be "directly concerned with" voting procedures. Defendants opine that criminalizing intentionally false speech that is only "related to" voting procedures runs too great a risk of impairing constitutionally protected speech. Defendants' dispute on this point is with our Supreme Court, because it specifically chose the phrase "related to" in the process of ensuring the statute did not impede speech falling within the purview of constitutional protection. *Burkman II*, ___ Mich at ___; slip op at 30-33.

We conclude there was probable cause to believe the robocall related to voting procedures. The *Burkman II* Court did not define "procedure."[9] When a term is not defined, it may be interpreted in accordance with its ordinary meaning, its context, or in consultation with a dictionary definition. See *People v Lewis*, 302 Mich App 338, 342; 839 NW2d 37 (2013). A "procedure" is "a particular way of accomplishing something or of acting," or "a series of steps followed in a regular definite order." Merriam-Webster's Collegiate Dictionary, (11th ed). The robocall informed voters that, if they chose to vote by mail, their information would be made part of a public database. Further, the robocall stated the database "will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts[.]" Lastly, the robocall warned about the CDC "pushing" to access and use those records "from mail-in voting to track people for mandatory vaccines."

There can be no reasonable dispute that voting by mail is a voting procedure. That is, voting by mail is "a particular way of accomplishing" voting, which fits the definition of "procedure." The robocall was related to the procedure, because it alleged that, if a voter used the voting procedure identified, certain negative events "will" occur. Those events involved a creation of a database that "will be" accessed by police and credit card companies to track down warrants and debts.

Indeed, instead of attempting to dispute this, defendants contend the robocall was not actually about the voting procedure, but about consequences. Defendants read "voting procedures" in a vacuum, ignoring that the robocall need only "relate to" the voting procedure. As is clear from the language used in it, the "consequences" cited by the robocall were attached solely to voting by mail, which is a voting procedure. Moreover, the definition of procedure as "a series of steps followed in a regular definite order" contemplates that procedure will incorporate one act

---

[9] We note that there are various statutory provisions addressing the conduct of elections and manner of voting, see MCL 168.720, as well as absent voting, see MCL 168.758. Additionally, there are administrative rules governing absentee voter applications, see R 168.21, as well as election manuals addressing absentee voter requirements and applications. Our Supreme Court did not correlate the limited construction test of MCL 168.932(a) to those election statutes, regulations, or manuals. And, the parties' supplemental briefs analyze the issue by applying dictionary definitions. Our analysis of the issue similarly follows suit.

after the other, in effect a consequence. Even so, defendants insist voting procedures as used in the limiting construction cannot include consequences of voting because, otherwise, political speech would be unconstitutionally impaired. The concern by defendants is overstated because, in making the argument, they conflate "voting procedures" with "voting." Defendants provide an example of the consequence *of voting* for a certain candidate, not a consequence of using a particular voting procedure. The distinction is important because our Supreme Court was specific that the intentionally false speech must relate to a voting requirement or procedure. This means that intentionally false speech about voting for a particular candidate would not be covered, because it relates to the person's vote, not how it is cast. In the present case, a jury could conclude that the robocall was designed to intimidate or prevent mail-in voting by offering that the process resulted in the creation of public database utilized to address a voter's outstanding arrest warrants or debts.

In considering all of the evidence above, and after addressing defendants' arguments, we conclude there was "a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief" that the robocall contained intentionally false speech related to a voting procedure. *Burkman II*, ___ Mich at ___; slip op at 7, 33 (quotation marks and citation omitted). Stated differently, there was probable cause to believe defendants' actions fell within the Court's limiting construction. *Id*. Consequently, the circuit court's order affirming the district court's bindover was not erroneous.

The last direction from our Supreme Court was to "resolve defendants' remaining constitutional arguments." *Id*. at ___; slip op at 34. In their supplemental brief on appeal, defendants state their remaining constitutional argument was "that MCL 168.932(a) was unconstitutional as applied to defendants because the statements in the robocall were opinions and plausibly true." But, to ensure that MCL 168.932(a) is not constitutionally overbroad, the charged conduct must be solely speech, intentionally false, relate to voting procedures, and made in a manner to attempt to deter or influence an elector's vote. *Burkman II*, ___ Mich at ___; slip op at 33. We cannot conclude, as a matter of law, that the robocall content reflected that it was merely an opinion[10] regarding mail-in voting procedure and plausibly true. Rather, the robocall stated that if an elector used mail-in voting his personal information "will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts[.]" This robocall indicated that personal information was collected into a public database from mail-in voting and that information "will" be used by the police and credit card agencies in a manner that would potentially harm an elector. Yet, Craine testified that the police and credit card agencies had never utilized the qualified voter file in that manner, and there were other resources that those entities would employ. Further, Craine testified that the qualified voter file was monitored, and entities requesting access to the qualified voter file were vetted. Even if Craine had testified that the police and credit card agencies may have requested the qualified voter file, an examining magistrate may not refuse to bind over a defendant

---

[10] See e.g., *Edwards v Detroit News, Inc*, 322 Mich App 1, 15; 910 NW2d 394 (2017) ("[I]n newspaper editorials and opinion pieces a reasonable reader 'expects to find the opinions and biases of the individual writers[.]' ").

when the evidence conflicts or raises a reasonable doubt concerning a defendant's guilt. *People v Yost*, 468 Mich 122, 128; 659 NW2d 604 (2003).

Having addressed the issues presented on remand, we affirm the trial court's denial of defendants' motion to quash.

/s/ Anica Letica
/s/ Michelle M. Rick