*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

RONALD TROMBLY,

        Plaintiff-Appellant,

v

ANTHONY REEDER,

        Defendant-Appellee,

and

PHILLIP CAMARDA,

        Defendant.

UNPUBLISHED
December 23, 2025
12:21 PM

No. 365764
Macomb Circuit Court
LC No. 2020-004547-NO

Before: WALLACE, P.J., and RICK and GARRETT, JJ.

PER CURIAM.

In 2020, defendant Anthony Reeder challenged plaintiff, Ronald Trombly, in an election for Lenox Township Supervisor. Reeder and defendant Phillip Camarda designed a campaign flyer promoting Reeder in the election. Trombly filed this action, asserting, among other allegations, that the flyer was defamatory. The trial court granted summary disposition under MCR 2.116(C)(10) in favor of defendants with respect to some of Trombly's claims. During trial, the court granted defendants' motions for directed verdict on the remaining claims. Trombly appeals by right the order granting the motions for directed verdict. He also challenges the previous order granting partial summary disposition in defendants' favor. We conclude that the trial court erroneously analyzed the alleged defamatory statements on the flyer independently rather than collectively and failed to consider that the statements were communicated via a campaign flyer circulated by Trombly's political opponent. We therefore vacate the order and remand for reconsideration as discussed in this opinion. Because we vacate the summary-disposition order in its entirety, including the trial court's rulings that allowed some of Trombly's claims to proceed to trial, we need not address Trombly's argument that the trial court erred by granting defendants' motions for directed verdict.

## I. FACTUAL BACKGROUND

-1-

Lenox Township voters first elected Trombly as the Lenox Township Supervisor in 2008 and reelected him in 2012 and 2016.  In 2020, Reeder challenged Trombly for the position.  That summer, Camarda, a former Lenox Township Code Enforcement Officer, contacted Reeder and assisted him in designing campaign literature—the flyer at issue in this case.  Camarda and Reeder sent the flyer to the electorate twice before the November 2020 election.  Trombly asserts that the following statements in the flyer were untrue and defamatory:

1) Vote out Corruption!

2) You've paid the legal fee's [sic] for <u>Trombly's sexual harassment misconduct</u> in office.

3) Trombly promoted his brother to <u>DPW [Department of Public Works] Director</u> and <u>Assistant Fire Chief</u> at the same time.  This is blatant Nepotism.  <u>(Imagine 2 Pensions paid by you the tax payer)!</u>

4) Trombly is <u>rarely in his office</u>, yet receives full pay and benefits from your tax dollars.

5) Township Debt $1.5 Million (Trombly!)

6) Trombly <u>Hired a full time CITY PLANNER</u> for our small Township.  <u>He has nothing to do, yet you're paying a full salary + benefits</u>.  Another example of tax dollar abuse.  [Bold print omitted.]

Although this litigation has focused on those six statements, the flyer contained other statements as well.  The front of the flyer read as follows:

The back of the flyer stated:

-2-

# Vote out Corruption!

- Ron Trombly has IGNORED the People!
- Trombly uses the office for personal business!
- Township Debt $1.5 Million (Trombly)!
- Trombly abuses the office with Nepotism!
- Trombly is NOT a servant of the people but only a servant of HIMSELF!
- Where is Ron Trombly? He's never in his office!

The committee to elect Anthony Reeder
Want to Contribute to the fight against Ron Trombly and his Corruption? Call (586) 808-4095

In a close election, Trombly lost to Reeder. In December 2020, Trombly filed a complaint against Reeder, alleging defamation per se (Count I), intentional infliction of emotional distress (Count II), tortious interference with contractual relations (Count III), and false-light invasion of privacy (Count IV). Reeder admitted sending the flyers, but denied that the statements on them were defamatory because he made the statements with a good-faith belief in their veracity. He also denied that his actions caused Trombly's alleged damages. After Trombly became aware during discovery that Camarda assisted Reeder in creating the content on the flyer, Trombly amended his complaint to add Camarda as a defendant.

In his amended complaint, Trombly alleged the same four claims asserted in his original complaint against both defendants. He also added claims alleging civil conspiracy (Count V) and concerted action (Count VI).[1] Regarding the substance of his allegations, Trombly alleged that corruption constitutes defamation per se and that Statement 1 ("Vote out Corruption!") untruthfully conveyed that he received a benefit from the dishonest misuse of his office. He also alleged that the reference to "sexual misconduct in office" in Statement 2 constituted defamation per se by falsely imputing to him moral turpitude and illegal conduct in office. In addition, he asserted that Statement 3, regarding the promotion of his brother, Cameron Trombly, was false and defamatory because the Township Board (the Board), rather than Trombly, approved promotions. Trombly also maintained that Cameron had been the DPW Director for more than 10 years before Trombly first ran for office, Cameron was promoted to Assistant Fire Chief on the motion of the Township's Public Safety Director and a favorable vote of the Board, and neither

---

[1] Trombly later stipulated to dismiss his tortious-interference-with-contractual-relations and concerted-action claims.

-3-

the DPW position nor the Assistant Fire Chief position provided a pension as a benefit. Defendants denied the allegations and maintained that the statements were either truthful or constituted protected speech.

Reeder moved for summary disposition under MCR 2.116(C)(8) and (10), arguing that, as a public official, Trombly was required to prove by clear and convincing evidence that Reeder made the statements at issue with actual malice.[2] According to Reeder, discovery established that the statements were either substantially true or that he did not make them with actual malice. Reeder also asserted that Trombly's intentional-infliction-of-emotional-distress claim lacked merit because Reeder's conduct was not extreme and outrageous. Further, Reeder maintained that civil conspiracy required an underlying tort, which Trombly failed to prove.

In support of his motion, Reeder relied on his affidavit and deposition testimony stating that the theme of his campaign was to "call out" Trombly as a corrupt individual. Reeder had read news coverage of the bribery trial involving Fazal Khan, a Sterling Heights developer. The news coverage relayed allegations that Khan gifted Trombly a cell phone and a hunting and fishing trip, but Reeder admitted that Khan had no business dealings with the Township. When asked how a gift could constitute a bribe if Khan did not receive anything in return, Reeder responded that he did "not have an answer for that question." Reeder claimed that Camarda authored most of the statements on the flyer, including Statement 2 involving sexual harassment. Reeder asserted Camarda told him that Camarda quit working for the Township after Trombly informed Camarda during a meeting that female employees had accused Camarda of sexual harassment. Reeder further asserted Camarda stated that, during the same meeting, Trombly told Camarda that Trombly himself had been accused of sexual harassment and had been required to defend himself. Reeder admitted that he "found it peculiar" that Camarda quit working for the Township because he was allegedly falsely accused of sexual harassment, but he authored the statement on the flyer stating that Trombly had engaged in sexual harassment. Finally, regarding Trombly's rare office appearances, Reeder maintained that he understood Trombly was not in his Township office during office hours because he was busy with his real-estate business. Camarda concurred with Reeder's motion.

Trombly opposed Reeder's motion and maintained that every statement on the flyer was false. Trombly asserted that the statements constituted defamation per se because defendants asserted he sexually harassed women, imputing a lack of chastity, and accused him of misconduct in office, which was a crime. Trombly argued that defendants, as coconspirators, destroyed his reputation and inflicted emotional pain. He maintained Reeder's motivation was to win the election, and Camarda's motivation was revenge, but neither defendant had a good-faith belief in any of the allegations. Rather, they merely concocted a smear campaign.

Trombly also argued that the flyer put him in a false light, was designed as a part of a conspiracy to defame him and inflict emotional distress upon him, and characterized him as a criminal and his brother as a benefactor of his dishonesty. He asserted that he established the

---

[2] As discussed later in this opinion, actual malice occurs if "the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth." *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 114; 793 NW2d 533 (2010).

elements of intentional infliction of emotional distress and civil conspiracy because defendants worked jointly to publish the defamatory statements with the purpose of defaming him and causing him distress. He argued that his claims should survive summary disposition and be submitted to the trier of fact.

Trombly relied on his affidavit and deposition testimony stating that he had never been accused of or investigated for sexual harassment, and the Township therefore never retained an attorney regarding such allegations. He denied that he had ever been offered, let alone accepted, a bribe. He maintained that, when Reeder sent the flyer, the Township had a revenue surplus of over $14 million. He stated that sewer bonds, which resulted in a $19 million debt, had been passed before he took office and that he only voted to refinance them—and did so at a lower rate. He asserted the DPW hired his brother Cameron before he took office and he alone did not promote Cameron. He denied that Cameron was eligible for a pension, much less two pensions. He added that the Board, not he, hired the City Planner, and the position was a part-time position with hourly pay and no benefits. Further, he maintained that he worked without a fixed schedule and denied using his office for personal business. He also denied that he had ever been investigated for misconduct in office and denied traveling with Khan, who had never done business with the Township. Finally, Trombly maintained that he suffered from depression as a result of the defamatory statements and sought professional help.

The trial court granted summary disposition in part and denied it in part. The court ruled that Statement 1 ("Vote out Corruption!") was merely an exaggeration, similar to those often used in a campaign and was not defamatory per se. The court determined that Statement 4 ("Trombly is rarely in his office, yet receives full pay and benefits from your tax dollars.") did not impute a crime and therefore did not constitute defamation per se. The court also concluded that Trombly failed to present clear and convincing evidence that defendants made either statement with actual malice. The court therefore granted summary disposition for both defendants regarding Statements 1 and 4.

The court also granted summary disposition in Reeder's favor regarding Statements 3, 5, and 6. Regarding Statement 3 ("Trombly promoted his brother to DPW Director and Assistant Fire Chief at the same time. This is blatant Nepotism. (Imagine 2 Pensions paid by you the tax payer)!"), the court determined that Trombly could not establish actual malice by showing that Reeder merely failed to investigate how and when Cameron was promoted before making the statement. Concerning Statement 5 ("Township Debt $1.5 Million (Trombly!)"), the court relied on Reeder's deposition testimony stating he discovered only after he assumed office that the $19 million debt resulted from a water/sewer bond. The court repeated that insufficient investigation did not establish that Reeder made the statement with reckless disregard for its truth. Regarding Statement 6 ("Trombly Hired a full time CITY PLANNER for our small Township. He has nothing to do, yet you're paying a full salary + benefits. Another example of tax dollar abuse."), the court determined that Reeder discovered after making the statement that it was false, but there was no evidence that he had serious doubts about the truth of the statement at the time of publication. The court therefore granted summary disposition in Reeder's favor regarding Statements 3, 5, and 6. The court denied summary disposition for Camarda regarding the same statements because Camarda's concurrence failed to present any argument showing that he did not make those statements with actual malice.

-5-

With respect to Statement 2 ("You've paid the legal fee's [sic] for Trombly's sexual harassment misconduct in office."), the trial court denied summary disposition for both defendants. The court determined that there existed a question of fact regarding whether defendants made the statement with actual malice. Regarding Reeder specifically, the court opined that the question of fact involved whether Reeder "had obvious reasons to doubt the veracity or accuracy of Camarda's statements," because Camarda himself had been accused of sexual harassment and left his Township employment as a result.

Regarding Trombly's false-light-invasion-of-privacy claim, the trial court granted summary disposition in Reeder's favor with respect to all statements except Statement 2. The court reasoned that it already determined that Reeder did not act with actual malice regarding Statements 1, 3, 4, 5, and 6 and that a genuine issue of material fact existed regarding whether Reeder made Statement 2 with actual malice. The court denied summary disposition in Camarda's favor regarding all the statements on the basis that Camarda failed to present any argument that he did not make the statements with actual malice.

With respect to Trombly's intentional-infliction-of-emotional-distress claim, the trial court granted summary disposition for both defendants on the basis that their conduct was not "so extreme and outrageous to permit recovery." The court noted that it was common in an election for opponents to trade "insults, indignities, threats, annoyances, petty oppressions, and other trivialities."

Finally, the trial court denied summary disposition regarding Trombly's civil-conspiracy claim, determining that Trombly's defamation-per-se claim involving Statement 2 could serve as the underlying tort to support the civil-conspiracy claim. Consequently, the court granted summary disposition for Reeder on all claims except defamation per se, false-light invasion of privacy, and civil conspiracy regarding Statement 2 only. Regarding Camarda, the court granted summary disposition with respect to Statements 1 and 4 of Trombly's claims alleging defamation per se and intentional infliction of emotional distress. The court denied summary disposition in Camarda's favor with respect to Trombly's remaining claims.

At trial,[3] defendants moved for a directed verdict, arguing that Trombly had failed to present evidence that they entertained serious doubts about the veracity of the alleged defamatory statements. After reciting the applicable law, the trial court granted the motions, stating, in relevant part:

> The court in this case is going to grant the directed verdict as to the defendant Reeder and as to the defendant Camarda. I find that there is no evidence on this record that would substantiate malice in either—in either regard. This is a political—political matter. And I'm not saying that I approve of the literature or anything else. That's not for the court. That's not up to the court. The court has to find according to the law that and—and as I said that defamation in a campaign

---

[3] The judge who presided over trial was not the same judge who decided the summary-disposition motion.

-6-

such as this and I can't find it [sic]. So therefore, I'm granting the directed verdict on both parties.

Thereafter, Trombly filed this appeal.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Trombly challenges the trial court's order granting partial summary disposition in defendants' favor.[4] We review de novo a trial court's decision on a motion for summary disposition. *1373 Moulin, LLC v Wolf*, 341 Mich App 652, 663; 992 NW2d 314 (2022). "When a motion seeks summary disposition under both (C)(8) and (C)(10), but the parties and trial court rely on matters outside of the pleadings, we review the matter through the lens of (C)(10)." *Mazzola v Deeplands Dev Co, LLC*, 329 Mich App 216, 223; 942 NW2d 107 (2019). A motion for summary disposition under subrule (C)(10) tests the factual sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). The trial court must consider all of the evidence that the parties submit in the light most favorable to the nonmoving party. *Id*. The opposing party may not rely on mere allegations or denials, but must provide evidence setting forth particular facts that demonstrate a genuine issue of fact for trial. *Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 449; 980 NW2d 119 (2021). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 507; 991 NW2d 230 (2022) (quotation marks and citation omitted).

### B. DEFAMATION PER SE

"The law of defamation lies at a crossroads with that of the First Amendment." *Reighard v ESPN, Inc*, 341 Mich App 526, 537; 991 NW2d 803 (2022). While the First Amendment "protects, in part, freedom of speech and freedom of the press," the law of defamation "seeks to protect against injury to reputation caused by the publication of falsehoods." *Id*. "[T]he United States Constitution does not protect defamatory speech." *TT v KL*, 334 Mich App 413, 443; 965 NW2d 101 (2020). "A defamatory communication is a communication that tends to harm a person's reputation, thereby lowering the person in the estimation of the community or deterring others from dealing or associating with them." *Id*. To establish a defamation claim, a plaintiff must prove:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the

---

[4] Reeder erroneously argues that this Court lacks jurisdiction to review Trombly's arguments pertaining to the summary-disposition order. "A party claiming an appeal of right from a final order is free to raise issues on appeal related to prior orders." *Green v Ziegelman*, 282 Mich App 292, 301 n 6; 767 NW2d 660 (2009) (quotation marks, brackets, and citation omitted).

part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Edwards v Detroit News, Inc*, 322 Mich App 1, 12; 910 NW2d 394 (2017) (citation omitted).]

To constitute defamation per se, a publication must impute the commission of a criminal offense or a lack of chastity.[5] *Lakin v Rund*, 318 Mich App 127, 133; 896 NW2d 76 (2016). In such cases, injury to the defamed person's reputation is presumed even absent proof of damages. *Burden v Elias Bros Big Boy Restaurants*, 240 Mich App 723, 728-729; 613 NW2d 378 (2000).

Moreover, where, as here, the plaintiff is a public official, more than negligence regarding the alleged defamatory statement is required—the official must establish that the defendant made the statement with "actual malice." *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 114; 793 NW2d 533 (2010). " 'Actual malice' exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth." *Id*., quoting *New York Times v Sullivan*, 376 US 254, 280; 84 S Ct 710; 11 L Ed 2d 686 (1964). Our Legislature has codified the actual malice standard. MCL 600.2911(6) provides:

> An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.

Thus, at a minimum, a plaintiff must show by clear and convincing evidence that the defendant made the defamatory statement with "reckless disregard for the truth." *Smith*, 487 Mich at 114. "Clear and convincing proof is that which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the precise facts in issue." *Id*. at 114-115.

A plaintiff cannot prove reckless disregard by demonstrating the defendant's failure to investigate the accuracy of a statement before publishing it. *Id*. at 117. Rather, the plaintiff must present evidence from which the fact-finder can conclude that the defendant either made the statement with "a high degree of awareness of [its] probable falsity," or "entertained serious doubts" regarding its truth. *Id*. at 116. Moreover, "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of a publication is sufficient to find reckless disregard." *Id*. at 117 (quotation marks and citation omitted). "In a case . . . involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte-Hanks Communications, Inc v Connaughton*, 491 US 657, 688; 109 S Ct 2678; 105 L Ed 2d 562 (1989) (quotation marks and citation omitted). Therefore, evidence concerning motive may be relevant

---

[5] Our Legislature codified this principle by enacting MCL 600.2911(1), which provides: "Words imputing a lack of chastity to any female or male are actionable in themselves and subject the person who uttered or published them to a civil action for the slander in the same manner as the uttering or publishing of words imputing the commission of a criminal offense."

in demonstrating actual malice, and "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Id.* at 668.

Further, "not all statements that can be read as accusations of a crime or misconduct should be considered assertions of fact." *Ghanam v Does*, 303 Mich App 522, 545; 845 NW2d 128 (2014). "[S]tatements that cannot be interpreted as stating actual facts about an individual" are constitutionally protected. *Id*. at 546. "Such statements include the usual rhetorical hyperbole and imaginative expression often found in satires, parodies and cartoons . . . even when the statements are designed to be highly offensive to the person criticized, and even if, when read literally, the statements can be interpreted as accusations of criminal activity." *Id*.

> Terms such as "blackmailer," "traitor," "crook," "steal," and "criminal activities" must be read in context to determine whether they are merely exaggerations of the type often used in public commentary. Casual use of these terms and similar epithets is the language of the rough-and-tumble world of politics. It is core political speech. It is consumed by an often skeptical and wary electorate and is not seriously regarded as asserting factual truth. If a reasonable reader would understand these epithets as merely rhetorical hyperbole meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct, they cannot be regarded as defamatory. [*Id*. (quotation marks and citations omitted).]

"Even statements couched in terms of opinion may often imply an assertion of objective fact and, thus, can be defamatory." *Id*. at 545. If, "when viewed in context, the entire statement cannot be deemed to be an assertion of a provable fact . . . it is not defamatory." *Ghanam*, 303 Mich App at 546. "The dispositive question . . . is whether a reasonable fact-finder could conclude that the statement implies a defamatory meaning." *Smith*, 487 Mich at 128. "The context and forum in which statements appear . . . affect whether a reasonable reader would interpret the statements as asserting provable facts." *Ghanam*, 303 Mich App at 546. Therefore, a statement must be read in context. *Id*. at 550.

In *Greenbelt Co-op Pub Ass'n v Bresler*, 398 US 6, 7; 90 S Ct 1537; 26 L Ed 2d 6 (1970), Charles Bresler, a prominent local real estate developer filed a defamation claim against the publishers of the Greenbelt News Review, a local newspaper in Greenbelt, Maryland. Bresler sought a zoning variance from the Greenbelt City Council that would allow him to build high-density housing on land that he owned. At the same time, the city of Greenbelt sought to purchase other property that Bresler owned, intending to construct a high school on the property. The negotiations of both matters sparked controversy, and members of the community voiced their views at city council meetings, some using the word "blackmail" in reference to Bresler. *Id*.

The Greenbelt News Review reported on the city council meetings, repeating the word "blackmail" in its news articles. Bresler filed a libel claim against the publishers of the newspaper, alleging that the use of the word "imputed to him the crime of blackmail." *Id*. at 8. The United States Supreme Court held that the word, in the context of the articles, was not libelous. *Id*. at 13. The Court stated:

> There can be no question that the public debates at the sessions of the city council regarding Bresler's negotiations with the city were a subject of substantial

concern to all who lived in the community. The debates themselves were heated, as debates about controversial issues usually are. During the course of the arguments Bresler's opponents characterized the position he had taken in his negotiations with the city officials as 'blackmail.' The Greenbelt News Review was performing its wholly legitimate function as a community newspaper when it published full reports of these public debates in its news columns. If the reports had been truncated or distorted in such a way as to extract the word 'blackmail' from the context in which it was used at the public meetings, this would be a different case. But the reports were accurate and full. . . .

It is simply impossible to believe that a reader who reached the word 'blackmail' in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. [Footnote omitted.] On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime. [*Id*. at 13-14.]

Thus, the Court looked at the context in which the word "blackmail" was used in analyzing whether the newspaper asserted a provable, factual allegation against Bresler.

In *Ghanam*, 303 Mich App at 524-525, the plaintiff filed a complaint alleging defamation against several unknown persons who posted allegedly defamatory messages on an Internet message board called The Warren Forum (the Forum). The plaintiff worked as the city of Warren's deputy superintendent of the department of public works. *Id*. at 524. The statements at issue were posted by persons who used pseudonyms in lieu of their names and accused the plaintiff of involvement with the disappearance of approximately 3,647 tons of road salt from city storage facilities and the theft and sale of tires from city garbage trucks. *Id*. at 525.

In analyzing whether the statements posted on the message board asserted provable facts, and were therefore capable of defamatory meaning, this Court recognized that other courts that have addressed the issue "have concluded that Internet message boards and similar communication platforms are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact." *Id*. at 546-547. "Any reader familiar with the culture of most electronic bulletin boards would know that board culture encourages discussion participants to play fast and loose with facts." *Id*. at 547 (quotation marks, brackets, ellipses, and citation omitted). "Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their statements accordingly." *Id*. (quotation marks and citation omitted). This Court concluded that, when read in context, the statements could not be interpreted as assertions of fact, but rather, constituted "acerbic critical comments directed at plaintiff based on facts that were already public knowledge, namely the apparent misappropriation of a large amount of rock salt and the controversial purchase of additional garbage trucks." *Id*. at 550. This Court further stated:

The joking, hostile, and sarcastic manner of the comments, the use of an emoticon showing someone sticking their tongue out, and the far-fetched suggestion that plaintiff somehow hid over 3,600 tons of salt near the city sports complex all indicate that these comments were made facetiously and with the intent to ridicule, criticize, and denigrate plaintiff rather than to assert knowledge of actual facts. Examination of the statements and the circumstances under which they were made show them to be mere expressions of rhetorical hyperbole and not defamatory as a matter of law.

In deciding the motion for summary disposition in the instant case, the trial court erred by considering the alleged defamatory statements in isolation rather than in context with one another and with the other statements on the flyer. The court also erred by failing to consider the format through which the statements were communicated—a campaign flyer circulated by Trombly's political opponent. Although Trombly was required to identify the precise statements he alleged were defamatory, *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 262; 833 NW2d 331 (2013), the trial court was required to consider the statements in context and in light of the format used to communicate the statements, *Ghanam*, 303 Mich App at 546, 550. "[C]ontext matters in analyzing an allegedly defamatory statement," and "a statement must be examined in its totality in the context in which it was uttered or published." *Smith*, 487 Mich at 129 (quotation marks and citation omitted). Further, "a court must consider all the words used in allegedly defamatory material, not merely a particular phrase or sentence." *Id*. (quotation marks and citation omitted).

Because the trial court failed to consider the statements in context, including the fact that the flyer was a political mailing by Trombly's opponent, we vacate the trial court's summary disposition rulings regarding Trombly's defamation-per-se claims and remand for consideration of Reeder's motion for summary disposition and Camarda's concurrence with the motion under the correct approach as discussed in this opinion. The trial court's error resulted in this case proceeding to trial based on only select statements made on the flyer when the proper approach required an examination of the flyer as a whole. Therefore, we must vacate all of the trial court's defamation-per-se determinations in the October 7, 2022 order.

## C. FALSE-LIGHT INVASION OF PRIVACY AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Trombly also argues that the trial court erred by granting summary disposition in Reeder's favor on his claim alleging false-light invasion of privacy predicated on Statements 1, 3, 4, 5, and 6, and that the court erred by dismissing his intentional-infliction-of-emotional-distress claim against both defendants. Because the principles previously discussed regarding defamation claims also apply to claims alleging false-light invasion of privacy and intentional infliction of emotional distress, the trial court erred by granting summary disposition with respect to those claims as well.

"In order to maintain an action for false-light invasion of privacy, a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 69; 919 NW2d 439 (2018) (quotation marks and citation omitted). "[T]he defendant must have known of or acted in reckless disregard as to the falsity of

-11-

the publicized matter and the false light in which the plaintiff would be placed." *Id*. (quotation marks and citation omitted).

To establish intentional infliction of emotion distress, a plaintiff must show: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Swain v Morse*, 332 Mich App 510, 534; 957 NW2d 396 (2020) (quotation marks and citation omitted). The complained-of conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Lucas v Awaad*, 299 Mich App 345, 359; 830 NW2d 141 (2013) (citation and quotation marks omitted).

This Court previously recognized that the legal principles applicable to defamation claims apply to claims alleging false-light invasion of privacy and intentional infliction of emotional distress. *Ireland v Edwards*, 230 Mich App 607, 624; 584 NW2d 632 (1998). In *Hustler Magazine, Inc v Falwell*, 485 US 46, 56; 108 S Ct 876; 99 L Ed 2d 41 (1988), the Court determined that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress . . . without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true." Relying on *Hustler Magazine*, this Court stated as follows in *Ireland*, 230 Mich App at 624-625:

> The Supreme Court has made it clear that the above limitations on actionability (statements must be provable as false, statements must be understandable as stating actual facts about the plaintiff, and, in the case of public-official or public-figure plaintiffs, the plaintiffs must prove actual malice by clear and convincing evidence) are First Amendment limitations. *Hustler Magazine, supra*. It is clear that these limitations are not exclusive to defamation claims. *Id*. We conclude that these limitations apply to all of plaintiff's claims in this case. [Footnote omitted.] Thus, because all of plaintiff's claims are based on the same statements, and because she cannot overcome the First Amendment limitations regarding these statements, summary disposition was properly granted with regard to all of plaintiff's claims.

In *Ireland*, the plaintiff alleged defamation, false-light invasion of privacy, and intentional infliction of emotional distress. *Id*. at 611. Therefore, because the same principles apply to all three claims in cases such as the instant case, we vacate the trial court's determinations granting summary disposition on Trombly's claims alleging false-light invasion of privacy and intentional infliction of emotional distress, and, similar to Trombly's defamation claims, we remand for reconsideration of those claims.[6]

---

[6] We likewise vacate the trial court's order to the extent that the court granted summary disposition with respect to Trombly's civil-conspiracy claims predicated on his false-light-invasion-of-privacy and intentional-infliction-of-emotional-distress claims. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or

### III. DIRECTED VERDICT

Because we have vacated the trial court's summary-disposition order in its entirety, we need not address Trombly's argument that the trial court erred by granting defendants' motions for directed verdict. The court's erroneous approach in analyzing Reeder's motion for summary disposition and Camarda's concurrence to the motion resulted in this case proceeding to trial based on select statements on the flyer. As previously discussed, the court was required to examine the flyer as a whole. We direct the trial court on remand to reconsider Reeder's motion and Camarda's concurrence under the correct approach as discussed in this opinion.

We vacate the October 7, 2022 order and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Randy J. Wallace
/s/ Michelle M. Rick
/s/ Kristina Robinson Garrett

---

to accomplish a lawful purpose by criminal or unlawful means." *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 384; 670 NW2d 569 (2003) (quotation marks and citation omitted). To claim civil conspiracy, a plaintiff must demonstrate an underlying actionable tort. *Id*. Trombly's civil-conspiracy claims were predicated on his claims alleging defamation, false-light invasion of privacy, and intentional infliction of emotional distress. Because we have vacated the trial court's summary-disposition rulings regarding those claims, we also vacate its ruling to the extent that it granted summary disposition with respect to the civil-conspiracy claims predicated on those claims.